E. Wayne HAGE and Jean
N. Hage, Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 91–1470 L.

United States Court of Federal Claims.

March 8, 1996.

Mark L. Pollot, Boise, Idaho, for plaintiffs. John E. Marvel, Elko, NV, was of counsel.

Dorothy R. Burakreis, General Litigation Section, Environment and Natural Resources Division, U.S. Department of Justice, Washington, D.C. for defendant. Susan V. Cook, David F. Shuey, Department of Justice and Eric C. Olson, Department of Agriculture, were of counsel.

Thomas D. Lustig, National Wildlife Federation, for amici curiae, State of Nevada, National Wildlife Federation, Nevada Wildlife Federation, Natural Resources Defense Council, and Sierra Club. Beth Wendel, National Wildlife Federation and Johanna H. Wald, Natural Resources Defense Council, were of counsel.

### OPINION

SMITH, Chief Judge.

Plaintiffs, E. Wayne and Jean N. Hage, are ranch owners in Nye County, Nevada. In this suit they allege constitutional, contractual and statutory causes of action. First, plaintiffs claim that the defendant took compensable property interests in their grazing permit, water rights, ditch rights-of-way, rangeland forage, cattle and ranch. Second, the plaintiffs claim that their grazing permit is a contract which the defendant has breached, entitling them to damages. Third, plaintiffs claim entitlement to compensation for improvements they have made to the public rangeland. Defendant has moved for summary judgment on all three claims.

The court grants in part and denies in part defendant's motion for summary judgment. The court finds that plaintiffs' grazing permit is a license, the cancellation of which does not give rise to damages. Thus, defendant's motion for summary judgment is granted for this claim. The court denies defendant's motion regarding the taking claims and the claim for compensation for improvements under 43 U.S.C. § 1752(g). The court finds that a limited evidentiary hearing is necessary to address the mixed questions of law and fact regarding the existence of the property interests claimed by plaintiffs in the water rights, forage rights and ditch rights-of-way. Plaintiffs also will have the opportunity to demonstrate a taking of their cattle. The court also finds that compensation may be required for improvements on the range made by plaintiffs if defendant cancelled the permit in part to devote the land to another public purpose.

### INTRODUCTION

Plaintiffs claim that defendant has taken their property rights in water, ditch rights-of-way, and forage which date from the 1800s. It is the court's duty to determine whether plaintiffs hold the property rights claimed, the scope of those rights, and whether government action has deprived the Hages of rights requiring just compensation under the Fifth Amendment.

There are various analyses, both pro and con, that view the court in a takings case as a defender against regulatory excess or as an activist advocate for certain policy positions. These analyses, it seems to the court, misconstrue the role of the judge in this important area of constitutional adjudication. While it is true that the judiciary has a particularly focused mission in protecting the liberties of the citizen, it is no less true that members of the legislative and executive branches have an equally heavy responsibility for guarding those same precious liberties. The judiciary is only seen as more involved in this task because it is the courts' only responsibility under the rule of law, while the Congress and the President are given numerous affirmative tasks in maintaining and defending a Nation based upon constitutional government.

In taking claims the judge does not sit as super legislator or executive, intent on preventing regulation that "goes too far," as a facile reading of Justice Holmes might imply. *See Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 415, 43 S.Ct. 158, 160, 67 L.Ed. 322 (1922). The job of the court is to deal with a concrete claim, by an aggrieved person or persons, that their constitutional rights under the Fifth Amendment have been violated by some governmental action. The court

must proceed to analyze this claim, as any other legal claim, regardless of the consequences to governmental policy. Unless property right claims are to be given lesser due process than other claimed constitutional violations, the court must interpret the words of the constitutional protection as it would any other language conferring rights. In this case the key terms, "property," "taken," and "just compensation," are concepts regularly dealt with in the law. The tools of this legal analysis are the same as those used in interpreting contracts, deeds, wills, regulations or any other legal instruments. The tools and skills of legal analysis have little to do with public policy, and much to do with the integrity of the rule of law.

In the concrete taking case the court must initially decide if the plaintiff has an actual property interest, if this is a point of dispute. This determination is based upon long and venerable case precedent, developed over the last two centuries. It is further clarified in the light of our law's Common Law antecedents. The Anglo–American case precedent is literally made up of tens of thousands of cases defining property rights over the better part of a millennium. The legal task is very unlike legislative policy-making because judicial decision-making builds historically and logically upon past precedent in narrow cases and controversies rather than current general exigencies or sweeping political mandates. The genius of our Framer's tripartite division of constitutional power is the creation of separated institutions that each best deal with different categories of governmental decisions. The Federalist No. 47 (James Madison).

If the court decides that plaintiff does have a property right based upon current law and precedent, the court must next determine whether that property right has been taken by the government. This is the point at which most of the confusion about the judge's role occurs, and not the least of this confusion comes from judges. While Holmes' sweeping and often brilliant rhetorical flourishes may receive some of the blame, the real problem is due to the nature of these "taking" disputes. Taking cases are invariably tough cases pitting strongly held values,

about significant public concerns, against other strongly held values and interests. This leads, too often, to the view of the judge as a policy maker, not a judicial decision-maker bound by constitutional language and precedent. To conclude that policy making is the nature of the court's role in taking cases, however, is to substitute a psychological impression or an ideological bent for hard legal analysis about property law and the Fifth Amendment. Taking cases are only about one thing, whether the government action in question takes private property without just compensation. Taking cases are not about "the environment" or "endangered species" or "wetlands." On these topics the courts must defer to the President and Congress.

When the court approaches the question of what is a "taking," it must use exactly the same tools as it uses in analyzing what constitutes a property right. What has the term meant historically; what has the binding precedent stated; and finally, what legal conclusions logically flow from the instant fact pattern. For if the word "taken" in the Fifth Amendment has no fixed meaning, other than the whim of the court, then all of the important purposes that the Framers assigned to a written Constitution are really worse than a paper wall against tyranny: they are a sham.

When a court finds a statute, a regulation, or a governmental action to be a "taking" requiring compensation, it is not saying the government went "too far." In fact, the court is saying nothing about the purpose or character of the governmental action whatsoever. Rather, the court is finding that the government has, as a factual matter, deprived an actual property owner of some part of a legally recognized property interest.

Courts have found the "too far" language taken by itself not to be very helpful in drawing the distinction between a taking and an incidental diminution in value. *See Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1015, 112 S.Ct. 2886, 2893, 120 L.Ed.2d 798 (1992); *Florida Rock Indus., Inc. v. United States*, 18 F.3d 1560, 1568 (Fed.Cir. 1994) (*cert. denied* —— U.S. ——, 115 S.Ct. 898, 130 L.Ed.2d 783 (1995)). Since Holmes penned those words, "too far," later Supreme

Court and other court opinions have laid down precedent that helps crystalize judicial analysis into a somewhat more coherent framework. This precedent indicates that after the court determines that the plaintiff indeed owned a property interest, the next step in the analysis is to determine whether there is any restriction inherent in the property that is derived from background principles of the state's law. *Lucas,* 505 U.S. at 1028–31, 112 S.Ct. at 2899–2902. For example property has never been understood to derive any value from activities that endanger public safety, health, or morals. Thus, an establishment distributing cocaine or pornography could be prohibited without any plausible claim of a taking since these activities have never been considered, as a matter of law, to add value to the property. *See, e.g., Bennis v. Michigan,* —— U.S. ——, 116 S.Ct. 994, 134 L.Ed.2d 68 (U.S.).

A second point of analysis is the historically recognized limitation on the uses of property that are characterized under the concept of reciprocal advantage. Certain restrictions, mainly in communities, are not takings because they impose general restrictions which apply broadly and confer benefits as well as burdens generally. Zoning law is the primary area where this concept limits what is a taking. *Village of Euclid, Ohio v. Ambler Realty Co.,* 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926).

A third general body of analysis limiting what is a taking is nuisance law. Nuisance is a historically grounded concept, it is not merely what the government prohibits at any one time. *Florida Rock Indus., Inc. v. United States,* 21 Cl.Ct. 161, 166–68 (1990) (*vacated on other grounds* 18 F.3d 1560 (1994), *cert. denied* —— U.S. ——, 115 S.Ct. 898, 130 L.Ed.2d 783 (1995). *See also Florida Rock Indus., Inc. v. United States,* 791 F.2d 893, 896 (1986). Otherwise, nuisance would devour the Fifth Amendment, because whatever the government prohibited the property owner from doing would never be a taking. While nuisance law evolves historically, only rarely has it evolved by immediate governmental fiat. Nuisance law has been our society's historic method for harmonizing one person's liberty with another person's rights.

The court must also look to the actual regulatory action challenged. Here again, it is not the soft focus "too far," but rather two groups of inquiries. First, what is the actual impact of the regulation on the property? Is it *de minimis* when compared with some of the other factors mentioned above? Or does it deprive the property owner of either substantially all of a recognized property interest, *See, e.g., Loveladies Harbor, Inc. v. United States,* 15 Cl.Ct. 381, 386–387 (1988) (summary judgment denied), 21 Cl.Ct. 153 (1990), *aff'd* 28 F.3d 1171 (Fed.Cir.1994); or of a significant portion of the value of the total property? *Florida Rock,* 18 F.3d 1560 (1994). Second, the court must look to custom and usage with respect to regulation of this specific type of property. Is this the kind of restriction that has historically been applied to the property and thus been a part of the property owner's understanding of its value, or as the cases have put it part of the property owners legitimate investment backed expectations? *Penn Central Transportation Co. v. New York City,* 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978). *See also Loveladies Harbor, Inc. v. United States,* 28 F.3d 1171 (Fed.Cir.1994); *Florida Rock,* 18 F.3d 1560.

While it might be justly said that this analysis is not as rigorous as a mathematical formula, judicial reasoning rarely is. It is, however, a far cry from the charge of being unprincipled or ideological. Rather, it uses the classic tools of law to make rule-bound decisions, irrespective of the merits of the governmental policies that lie behind the regulations at issue.

Finally, since the federal judge is not elected, as is the President and the Congress, it would be highly presumptuous of him or her in a democratic society to import into the judicial analysis, views on the need or the lack thereof for the government action challenged. The taking clause was not written to protect merely against frivolous exercises of governmental power, but more precisely to protect against the opposite. Presumably, the political process protects against most frivolous exercises. The protection of the Fifth Amendment is most needed to protect the minority against the exercise of govern-

mental power when the need of government to regulate is greatest, and the desire of the popular majority is strongest. In this way, and in this way only, does the judiciary properly affect policy, and that effect is to adjudicate the limits that the rule of law and a written Constitution impose upon popular government. The existence of property rights, not the judiciary's finding of a "taking," impose these limits.

## FACTS

Plaintiffs, Wayne and Jean Hage, purchased Pine Creek Ranch in 1978 and used it for cattle ranching. The ranch, established in 1865, is located in central Nevada and consists of approximately 7,000 acres. To raise cattle economically in such an arid region, plaintiffs depend upon access to large quantities of land, including government owned rangeland, and to the limited water supply in the Toiyabe National Forest. Plaintiffs use ditch rights-of-way, which are easements on federal lands, to transport water for irrigation, stock watering and domestic purposes.

In 1907 Congress created the Toiyabe National Forest. The Forest Service issued a grazing permit to the owners of Pine Creek Ranch, based upon the preferential use of the range, which enabled the various ranch owners to continue to graze their livestock on federal lands adjacent to Pine Creek Ranch. The Forest Service has granted each subsequent owner of Pine Creek Ranch such a grazing permit. Without access to water located in the Toiyabe National Forest, the ranch cannot successfully operate.

Plaintiffs received their first grazing permit on October 30, 1978 [1] which allowed them to graze cattle within six allotments of the Toiyabe National Forest.[2] The permit established general provisions and requirements for plaintiffs' use of the federal land for grazing. In addition to these general provisions, the permit also contained terms unique to plaintiffs. Such terms included number, kind and class of livestock permitted to graze, and the period of such use. Pursuant to their permit, plaintiffs could graze their cattle for specified portions of the year, depending upon the allotment.

Specific provisions in the permit reserved to the federal government the broad power to suspend, revoke or amend the permit subject to certain conditions. For example Part 1, § 3 of the permit stated in pertinent part:

[T]his grazing permit may be revoked or suspended, in whole or in part, for failure to comply with any of the provisions and requirements specified in Parts 1, 2 and 3 hereof, or any of the regulations of the Secretary of Agriculture on which this permit is based, or the instructions of Forest officers issued thereunder. . . .

In Part 2, § 8(b), the permit stated that the grazing privilege will terminate "whenever the area described in this permit is needed by the Government for some other form or use." Moreover, the government reserved the power in Part 2, § 6, to adjust any terms of the permit when necessary for resource protection.

In 1984, plaintiffs applied for and received a permit modifying their grazing allotment. The 1984 permit also contained new language broadening the scope of the Forest Service's authority to alter or nullify the grazing privilege. Part 1, § 4 stated:

This permit may be modified at any time during the term to conform with needed changes brought about by law, regulations, executive orders, allotment management plans, land management planning, numbers permitted or season of use necessary because of resource condition or other management needs.

Parts 2 and 3 of the 1984 permit also created additional requirements that plaintiffs had to satisfy as a condition for grazing on the public land. Under the 1984 permit, plaintiffs were responsible for additional maintenance and structural improvements on the federal lands. Plaintiffs also were required to graze at least 90% of the permitted num-

---

1. The term for each permit is ten years. Plaintiffs permit had an eight year term because plaintiffs' predecessor used the first two years of the ten year permit.

2. Table Mountain, Meadow Canyon, McKinney, Silver Creek, Monitor Valley (East & West).

ber of cattle or risk termination of their permit for "non-use." The Forest Service states that this provision was added to maintain the balance of forage resources and redistribute such resources in accordance with the Toiyabe Forest Plan. Def.Ex. 19, App. 000311. (Deposition Exhibit 108).

In 1991, the Forest Service modified plaintiffs' permit, and all other permits within the Toiyabe National Forest, to bring the permits into compliance with the new Toiyabe Forest Plan. The new permits did not substantially change the 1984 provisions.

The events which precipitated commencement of the present litigation began primarily from disputes over the Table Mountain and Meadow Canyon allotments.

### THE TABLE MOUNTAIN ALLOTMENT

In 1979, after receiving permission from the United States Forest Service, the Nevada Department of Wildlife (NDOW) released elk into the Table Mountain allotment area of the Toiyabe National Forest. The Forest Service approved the release after conducting two studies to determine the suitability of introducing elk into the area.

Plaintiffs objected to the release of the elk, arguing that the elk drank water and ate forage which belonged to plaintiffs and were needed for their cattle. Plaintiffs also informed the State of Nevada that the hunting season for elk on Table Mountain overlapped with the cattle grazing period and that the presence of elk impeded the grazing and movement of their livestock. The State of Nevada responded that cattle grazing and hunting on public land "appear to be reasonably compatible" and that plaintiffs' complaint was the first the State had received. The State informed plaintiffs that the ranchers and hunters must stop "squabbling" and share their usage of the public rangelands.

In October 1988, the Forest Service informed plaintiffs that they were in violation of their permit and risked its suspension or cancellation because plaintiffs failed to remove their cattle from the allotment by the September 30, 1988, deadline stated in the permit. Plaintiffs claimed that they were experiencing difficulty removing their cattle

due to recreational and Forest Service activities on the rangeland. Plaintiffs, however, did remove the majority of the cattle by October 22.

In January 1989, the Forest Service sent plaintiffs a letter to "show cause" as to why the Forest Service should not reduce by 20% the number of cattle permitted to graze for the 1989 grazing season on the Table Mountain allotment. The Forest Service also charged plaintiffs for the excess use of the rangeland for the time in October when plaintiffs' cattle were observed on the allotment after the September 30th deadline. Plaintiffs failed to respond to the letter.

In February 1989, the Forest Service notified plaintiffs that 20% of their cattle allotment for Table Mountain would be suspended for the 1989 grazing season. The Forest Service did not implement the 20% cattle suspension until the 1990 grazing season, however, because of administrative appeals of the agency action.

Plaintiffs, without notifying the Forest Service, did not graze any cattle on the Table Mountain allotment during the 1990 grazing season. The Forest Service determined that this action violated the "non-use" provision of the 1984 permit because plaintiffs failed to graze at least 90% of the total permitted cattle on the allotment.

In October 1990, the Forest Service sent plaintiffs another letter requesting plaintiffs to "show cause" why the Forest Service should not (a) cancel 25% of the permit to graze cattle on the allotment and (b) suspend an additional 20% under the permit of the remaining cattle allowed to graze for two successive years. The Forest Service believed such actions were warranted because plaintiffs' failure to control and take account of their livestock during the 1990 grazing season constituted repeated violations of the permit terms.

In November 1990, plaintiffs responded to the Forest Service's "show cause" letter. Plaintiffs requested an evidentiary hearing, contending that the Forest Service actions denied plaintiffs due process of law. Because an evidentiary hearing is not provided for in its regulations before cancellation or

suspension of a permit, the Forest Service did not grant the requested hearing. In December 1990, the Forest Service cancelled 25% of the Table Mountain allotment grazing permit and suspended an additional 20% of the remaining allotment for a two year period. The Forest Service decision was upheld in administrative appeals and plaintiffs did not seek judicial review of those appeals.

### THE MEADOW CANYON ALLOTMENT

Plaintiffs also dispute Forest Service actions concerning the Meadow Canyon allotment. In 1980, the Forest Service diverted the flow of water in the Meadow Canyon allotment from Meadow Spring to Q (McAffee) Spring, claiming that Meadow Spring was contaminated. The Forest Service then used the new source from Q Spring as a domestic water supply for the Guard Station located in the Toiyabe National Forest. The Forest Service, however, neglected to obtain approval from the State Engineer for a change in point of diversion of the water.

Plaintiffs claim rights to *all* the water of Meadow Canyon Creek, allegedly appropriated by Pine Creek Ranch in 1868, including both Meadow Spring and Q Spring. In October 1981, plaintiffs filed a request with the State Engineer to initiate a water rights adjudication of the Monitor Valley.[3] The State granted the petition.[4] Plaintiffs requested the adjudication to prevent the Forest Service from diverting water which plaintiffs allegedly owned.

During the summer of 1990, defendant notified plaintiffs that because of serious range deterioration, plaintiffs would be required to remove their cattle from Meadow Canyon by August 10, 1990, rather than the permit date of October 15, 1990. Plaintiffs' expert, Robert N. Schweigert,[5] disputed defendant's opinion and considered the Meadow Canyon allotment to be in good to excellent condition

when compared with other Western rangeland. Under the permit, the Forest Service must give permittees one year notice of the permit modification. In an extreme emergency, however, the Forest Service may immediately reduce the number of livestock or time of grazing to preserve or protect the rangeland.

In August 1990, defendant sent plaintiffs a letter requesting plaintiffs to "show cause" why 100% of plaintiffs' Meadow Canyon allotment should not be cancelled because of plaintiffs' refusal to remove their cattle from Meadow Canyon. Plaintiffs began to remove their cattle at the end of August 1990. Defendant, however, observed 128 head of plaintiffs' cattle (38% of the total number originally permitted) on the allotment in October 1990 and concluded that plaintiffs had made no serious effort to comply with the Forest Service's instructions. The Forest Service informed plaintiffs that any of its livestock found on the Meadow Canyon allotment after November 12, 1990, would be subject to impoundment.

On February 13, 1991, defendant suspended the permit for five years and cancelled 38% of the permitted numbers allowed in Meadow Canyon. This percent decrease is identical to the percentage of plaintiffs' cattle found on the allotment in October 1990, in violation of the Forest Service's instructions.

In the summer of 1991, the Forest Service twice impounded plaintiffs' cattle after allegedly observing many of plaintiffs' cattle on the Meadow Canyon allotment. Plaintiffs dispute the basis for the removal and impoundment of the cattle, arguing that if any of plaintiffs' cattle were observed on the Meadow Canyon allotment in the spring and summer of 1991, it was due to interference and actions by the defendant, not plaintiffs.

---

**3.** The Monitor Valley water rights adjudication is distinct from the Monitor Valley allotment.

**4.** The Monitor Valley adjudication, which began in 1981, is still in process over a decade later. The Office of the Attorney General for the State of Nevada stated that a *draft* Preliminary Order of Determination of the Relative Rights In and To the Waters of Monitor Valley *may* be ready for the State Engineer's review by spring of 1996.

**5.** Mr. Schweigert worked as a Range Conservationist and Range Studies Specialist for the Bureau of Land Management in Winnemucca, Nevada, from 1980–1984. Mr. Schweigert then opened his own consulting business, Intermountain Range Consultants, in 1984.

*DITCH RIGHTS–OF–WAY*

Plaintiffs allegedly own ditch rights-of-way, which allow them to transport water for stock watering, irrigation, and domestic purposes. Plaintiffs and defendant acknowledge the importance of the ditch rights-of-way for transporting water. The parties, however, disagree over the scope of restrictions permitted regarding plaintiffs' alleged ditch rights-of-way pursuant to the Act of 1866 and the present regulatory scheme. In 1986, the Forest Service informed plaintiffs that it had the authority to regulate vested ditch rights-of-way and informed plaintiffs that any actions in maintaining the ditches must be approved by the Forest Service. In July 1991, plaintiff, E. Wayne Hage, and his employee, Lloyd C. Seaman, were arrested and convicted for cutting and removing trees within and around White Sage Ditch in the Toiyabe National Forest in violation of Forest Service regulations. The Ninth Circuit reversed the criminal conviction after determining that the United States had not proved each element of the criminal act. *United States v. Seaman and Hage,* 18 F.3d 649 (9th Cir.1994).

*CLAIMS*

In September 1991, plaintiffs filed a complaint alleging constitutional, contractual and statutory causes of action. Plaintiffs argue that they possess compensable property interests in their grazing permit, water rights, ditch rights-of-way, forage on the rangeland, cattle and ranch. According to plaintiffs, these property rights were taken by the federal government through physical and regulatory actions. First, plaintiffs allege that the suspension and cancellation of the grazing permit deprived them of their right to graze their cattle. Second, plaintiffs argue that they were deprived of their water rights by the Forest Service cancelling and suspending their permit and diverting and using their water. Third, plaintiffs claim that defendant took their property interest in the ditch rights-of-way by forbidding plaintiffs' access to the ditches. Fourth, plaintiffs claim that non-indigenous elk consumed forage and drank water reserved for plaintiffs' cattle in violation of plaintiffs' property rights. Fifth, plaintiffs claim that when the Forest Service impounded plaintiffs' cattle, defendant took plaintiffs' personal property. Sixth, plaintiffs allege that by cancelling and suspending portions of their grazing permit and interfering with their water rights, ditch rights-of-way, and forage, defendant has deprived plaintiffs of all economic use of their ranch.

In addition to the constitutional taking claims, plaintiffs argue that the grazing permit was a contract. Plaintiffs claim that by cancelling and suspending the permit, defendant breached the contract, entitling plaintiffs to damages. Finally, plaintiffs allege entitlement to compensation for improvements made to federal rangeland pursuant to 43 U.S.C. § 1752(g).

## DISCUSSION

### I. JURISDICTION

Before this court considers the merits of defendant's motion for summary judgment, the court must first address defendant's argument that this court does not have jurisdiction to hear plaintiffs' Fifth Amendment water rights taking claim. Defendant bases its jurisdictional argument on three theories: 1) that this court does not have jurisdiction over stream adjudications; 2) that this court does not have jurisdiction to determine title disputes in a water rights taking claim; and 3) that this federal court does not have jurisdiction based on considerations of federalism. In the alternative, defendant argues that even if this court decides that it does have jurisdiction over water rights taking claims, this court should dismiss the claim in deference to the currently pending Nevada stream adjudication.

Initially, defendant asserts that the jurisdiction granted to this court by Congress under the Tucker Act does not include jurisdiction to hear plaintiffs' water rights taking claim because the court's jurisdiction does not include general stream adjudications. Defendant bases this argument on the language within the Tucker Act that limits the court to hearing certain claims for money damages against the federal government.[6]

---

**6.** 28 U.S.C. § 1491, the Tucker Act, states in relevant part:

28 U.S.C. § 1491. Therefore, defendant argues that a water rights taking claim is outside the scope of this court's jurisdiction because the court would be adjudicating water rights among numerous parties rather than simply determining money claims against the federal government. Defendant further argues that because this court cannot join private defendants, this court does not have jurisdiction to determine plaintiffs' water rights relative to defendant's rights because the outcome would affect persons who are not parties in this lawsuit.

Next, defendant argues that the Tucker Act does not give this court jurisdiction to determine title to water rights. Defendant claims that because water cannot be measured or defined in a manner similar to real property, determining title to water is synonymous with stream adjudication. Defendant does acknowledge that this court may resolve land title disputes as a preliminary matter to determining whether the federal government has taken real property. *See Yaist v. United States,* 228 Ct.Cl. 281, 656 F.2d 616 (1981); *Bourgeois v. United States,* 212 Ct.Cl. 32, 545 F.2d 727 (1976). Defendant argues, however, that this court does not have the same jurisdiction to determine water title disputes as a preliminary matter to determine whether the federal government has taken water rights. In support of this position, defendant argues that land and water title disputes fundamentally are different because stream adjudications determine the correlative rights of all water users while quiet title actions resolve ownership in a single piece of defined land.

Finally, defendant claims that for various reasons the McCarran Amendment unequivocally requires this court to dismiss the water rights claim in deference to the Nevada stream adjudication. The McCarran Amendment waives the sovereign immunity of the United States with respect to general stream adjudications in state courts. 43 U.S.C. § 666. Based on this premise, defendant argues that the McCarran Amendment dic-

tates a clear federal policy that all lawsuits relating to water must be in state court. The McCarran Amendment also requires that all parties claiming an interest in a specific water body be invited to participate in the relevant adjudication to prevent piecemeal adjudication and confusion regarding the relevant water rights. 43 U.S.C. § 666; *See also Reynolds v. Lewis,* 88 N.M. 636, 545 P.2d 1014, 1015–16 (1976). Defendant further argues that because all parties claiming rights to use water from the Monitor Valley cannot be joined in this suit, this court cannot hear plaintiffs' water rights taking claim.

■ As an alternative to its argument opposing jurisdiction, defendant asserts that if this court has jurisdiction to adjudicate water rights, this court should decline to exercise jurisdiction in deference to the state adjudication proceeding. Defendant concedes that a party may bring an action in federal court, notwithstanding the pendency of an action in state court concerning the same matter, if the federal court rightfully has jurisdiction. *McClellan v. Carland,* 217 U.S. 268, 282, 30 S.Ct. 501, 504–05, 54 L.Ed. 762 (1910). Notwithstanding this general rule, defendant argues that the McCarran Amendment is an unusual statute designed to prevent inconsistent dispositions of water rights and the traditional rule allowing parallel proceedings does not apply. Defendant claims that the Supreme Court opinions in *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976), *reh. den. sub. nom. Akin v. United States,* 426 U.S. 912, 96 S.Ct. 2239, 48 L.Ed.2d 839 (1976) (*"Colorado River"*) and *Arizona v. San Carlos Apache Tribe of Arizona,* 463 U.S. 545, 103 S.Ct. 3201, 77 L.Ed.2d 837 (1983), *reh. den.* 464 U.S. 874, 104 S.Ct. 209, 78 L.Ed.2d 185 (1983) (*"San Carlos Apache"*), support defendant's position that the general rule of concurrent jurisdiction does not apply in water rights adjudication proceedings, and, therefore, this court should dismiss plaintiffs' water rights taking

(a)(1) The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

claim. Defendant claims that dismissal of this case is the only method which allows the state to continue its water adjudication process without the potential for inconsistent dispositions of property and duplicative litigation.

In contrast, plaintiffs argue that this court has jurisdiction to adjudicate plaintiffs' water rights and has an affirmative obligation to do so. Plaintiffs argue that the unresolved determination of title to water rights does not prevent this court from asserting jurisdiction. Plaintiffs note that a title dispute, as part of a taking claim, traditionally does not prevent jurisdiction in this court, assuming jurisdiction otherwise exists. *See Oak Forest, Inc. v. United States,* 23 Cl.Ct. 90 (1991); *M.R.K. Corp. v. United States,* 15 Cl.Ct. 538 (1988). Moreover, plaintiffs contend that determining title to water is no different than determining title to real property, and the same jurisdictional rules should apply to all forms of property.

Plaintiffs also claim that this court is the only forum in which to adjudicate their taking claim under the Tucker Act. *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976). Consequently, if this court does not accept jurisdiction, defendant would be allowed to take property of private citizens in violation of the Fifth Amendment without granting plaintiffs due process of law. Moreover, plaintiffs claim that forbidding them to proceed in this court in deference to the state stream adjudication effectively allows defendant to take plaintiffs' water rights for years without compensation because the state stream adjudication proceeding can take *decades* to resolve.[7]

Plaintiffs also argue that the McCarran Amendment does not preclude this court from adjudicating water rights. Citing the cases of *National Audubon Soc. v. Dep't of Water and Power,* 496 F.Supp. 499, 504 (E.D.Cal.1980) and *South Delta Water Agency v. United States Dep't of Interior,* 767 F.2d 531, 541 (9th Cir.1985), plaintiffs note that Congress passed the McCarran Amendment merely to waive the federal government's sovereign immunity and allow the

United States to be joined as a party in state stream and water rights adjudications. Plaintiffs argue that Congress did not intend to limit the forums available when addressing water rights. *See United States v. Cappaert,* 508 F.2d 313, 320–21 (9th Cir.1974), *aff'd* 426 U.S. 128, 96 S.Ct. 2062, 48 L.Ed.2d 523 (1976). Therefore, according to plaintiffs' argument, the McCarran Amendment does not prohibit jurisdiction in a federal court to adjudicate water rights.

Finally, plaintiffs assert that the case cited by defendant, *Colorado River,* strengthens plaintiffs' argument for jurisdiction by this court. In that case, plaintiffs argue that the Supreme Court held that when the federal government participates in a state proceeding under the McCarran Amendment, and the state proceeding does not adequately resolve federal claims, the federal court should not dismiss the water rights claims or abstain from asserting jurisdiction. *Colorado River,* 424 U.S. at 820, 96 S.Ct. at 1247–48. Similarly, plaintiffs argue that the Nevada water adjudication cannot address plaintiffs' taking claim and, therefore, under *Colorado River,* this court must address plaintiffs' claim.

▮ The court finds that the Tucker Act requires this court to exercise jurisdiction and that exercising jurisdiction is in no way contrary to the language or purpose of the McCarran Amendment. Under the Tucker Act, this court is granted jurisdiction to determine whether the government has taken any type of property interest protected by the Fifth Amendment. The Fifth Amendment provides in part, "nor shall private property be taken for public use without just compensation." The purpose of the "taking clause" is "to bar Government from forcing some people alone to bear public burdens, which, in all fairness and justice should be borne by the public as a whole." *Armstrong v. United States,* 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554 (1960). Were this not so, government would have a powerful and dangerous tool to discriminate against discrete and insular minorities of our population.

7. *See supra* note 4.

Moreover, the Fifth Amendment's protection is not confined to real property. A party may have a property interest in a mortgage, *see Shelden v. United States,* 34 Fed.Cl. 355 (1995); in a mineral estate, *see Whitney Benefits, Inc. v. United States,* 18 Cl.Ct. 394, 399 (1989), *aff'd,* 926 F.2d 1169 (Fed.Cir.1991), *cert. denied* 502 U.S. 952, 112 S.Ct. 406, 116 L.Ed.2d 354 (1991), in navigational servitudes, *see Kaiser Aetna v. United States,* 444 U.S. 164, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979); in air space, *see United States v. Causby,* 328 U.S. 256, 265 n. 10, 66 S.Ct. 1062, 1068 n. 10, 90 L.Ed. 1206 (1946); and in a leasehold estate, *see United States v. General Motors Corp.,* 323 U.S. 373, 377, 65 S.Ct. 357, 359, 89 L.Ed. 311 (1945), among others. Likewise, plaintiffs can have a property interest in water, and even defendant concedes that a water right is a type of property right. Thus, the court has no choice in exercising its jurisdiction here. This is especially true when both sides have admitted that the state water adjudication possibly may take decades! [8]

Determining whether the defendant has taken property, as one of this court's jurisdictional mandates, is not adjudicating water rights as defendant asserts. This court agrees with defendant that the U.S. Court of Federal Claims should not engage in stream adjudications. Stream adjudication is a creature of state law that enables a state to administer a system of recording property interests in water. States have created intricate processes to determine who exactly owns the right to use water within the state, as well as to determine whether a stream or river has been over-appropriated. This court should thus refrain from entering into the business of stream adjudication.

Contrary to defendant's argument, however, this court may determine if plaintiffs have title to water rights in the Monitor Valley without entering into a stream adjudication. This court has jurisdiction to determine title to real property as a preliminary matter when addressing a taking claim. *See e.g., Bourgeois v. United States,* 545 F.2d 727 (Ct.Cl.1976) (stating that in a suit seeking compensation, the court is not denied juris-

diction simply because their is a quite title issue involved in determining compensation); *Yaist v. United States,* 656 F.2d 616 (Ct.Cl. 1981). Similarly, this court may determine whether plaintiffs have title to a property interest in water as a preliminary matter before addressing whether that property interest has been taken by the government.

■ Moreover, plaintiffs are correct that the McCarran Amendment does not preclude federal courts from exercising jurisdiction regarding water rights claims. In *Colorado River,* the federal government brought suit against over one thousand water users in district court to adjudicate reserved water rights for itself and on behalf of certain Indian tribes under Colorado law. *United States v. Akin,* 504 F.2d 115 (10th Cir.1974), *rev'd on other grounds sub nom. Colorado River,* 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976). One of the defendants sought to join the government in the concurrent state proceeding to resolve all the government's claims. The issue presented was whether the McCarran Amendment repealed district-court jurisdiction under 28 U.S.C. § 1345. *Colorado River,* 424 U.S. at 800, 96 S.Ct. at 1238. Based upon the language of the amendment and its legislative history, the Supreme Court concluded that the amendment never was intended to diminish federal court jurisdiction. "The immediate effect of the amendment is to give consent to jurisdiction in the state courts concurrent with jurisdiction in the federal courts over controversies involving federal rights to the use of water." *Id.* at 809, 96 S.Ct. at 1242. The Court concluded that because the amendment did not clearly repeal district-court jurisdiction, the Court would not presume this intent. In a later application of *Colorado River,* the Supreme Court stated, "*Colorado River,* of course, does not require that a federal water suit must always be dismissed or stayed in deference to a concurrent and adequate comprehensive state adjudication." *Arizona v. San Carlos Apache Tribe of Arizona,* 463 U.S. 545, 569, 103 S.Ct. 3201, 3215, 77 L.Ed.2d 837 (1983).

---

**8.** *See supra* note 4.

Similarly, the language of the McCarran Amendment does not limit this court's jurisdiction to hear plaintiffs' water rights taking claim. The McCarran Amendment serves a limited purpose which defendant now seeks to expand. Senator McCarran, who introduced the legislation, stated in the Senate report that the legislation was "not intended to be used for any other purpose than to allow the United States to be joined in a suit wherein it is necessary to adjudicate all of the rights of various owners on a given stream." S.Rep. No. 755, 82D Cong., 1st Sess., 2 (1951). Congress passed this amendment because private parties and states never knew how much water the federal government might claim it owned. The McCarran Amendment forced the federal government to participate in water proceedings to create a final determination of water ownership. The court thus cannot abstain from its obligation to exercise its jurisdiction based upon a statute enacted merely as a waiver of the federal government's sovereign immunity in state stream adjudications. Defendant's position, in some ways, would be to turn the McCarran Amendment on its head.

Furthermore, the McCarran Amendment does not mandate an absolute policy of deference to state proceedings as defendant suggests. In *Colorado River*, the Supreme Court did not create a blanket rule requiring federal courts to decline jurisdiction to adjudicate water rights claims in deference to state proceedings. Rather, the Supreme Court expressed its reluctance to dismiss the proceeding noting the "virtually unflagging obligation of the federal courts to exercise the jurisdiction given them." *Colorado River*, 424 U.S. at 817, 96 S.Ct. at 1246, citing *England v. Medical Examiners*, 375 U.S. 411, 415, 84 S.Ct. 461, 464–65, 11 L.Ed.2d 440 (1964).

In conclusion, this court determines that based on the Tucker Act this court is required to exercise jurisdiction and that the McCarran Amendment does not affect such jurisdiction. Furthermore, this court is the only forum vested with jurisdiction to hear plaintiffs' Fifth Amendment taking claim and to deny plaintiffs a forum would violate their rights to due process of law.

## II. RIPENESS

Defendant argues that until Nevada completes the Monitor Valley adjudication, plaintiffs' water rights taking claim is unripe because plaintiffs' alleged water rights are not ascertainable or quantifiable. Defendant also argues that plaintiffs' ditch rights-of-way claim is not ripe for adjudication at this time. Because ripeness is a doctrine that affects this court's jurisdiction, the court must consider this issue before addressing the merits of defendant's motion for summary judgment.

Defendant's ripeness argument is a fraternal twin to its jurisdictional argument; defendant puts a different spin on the same logical structure to urge this court to dismiss plaintiffs' claim for lack of ripeness. Similar to its initial jurisdictional argument, defendant argues that until Nevada completes the Monitor Valley adjudication, plaintiffs' water rights taking claim must be dismissed because plaintiffs cannot prove ownership of the water rights. Defendant maintains that the only method by which plaintiffs can prove ownership of the water rights is through the statutory adjudication proceeding pursuant to Nevada law. Therefore, defendant contends that until the adjudication procedure is complete, plaintiffs cannot prove that they own the water rights. Hence, the water rights claim must be dismissed because plaintiffs cannot prove a present controversy ripe for adjudication.

Defendant also claims that plaintiffs' evidence of title to the water rights at issue is insufficient and too inconclusive to allow this court to consider plaintiffs' claim at this time. According to the defendant's argument, the two Nye County district court decisions which plaintiffs presented as evidence of ownership of their water rights are not valid proofs of title to water rights under Nevada law. Also, defendant asserts that even if these decisions are valid against private citizens, the decisions cannot bind the federal government because it was not a party to the proceedings. Therefore, according to the defendant, until Nevada completes the Monitor Valley adjudication and determines that plaintiffs own water used by the defendant,

plaintiffs' taking claim is merely a hypothetical question.

Concurrently, *amici* also argue that plaintiffs' water rights taking claim is not ripe for review because plaintiffs do not have conclusive title to those rights pursuant to the present Nevada statutory adjudication procedure. *Amici* argue that plaintiffs' claim of vested water rights through the court decrees in *Peterson v. Humphrey,* No. 588 (Nye County Dist.Ct, Nev.1879) and *United Cattle and Packing Co. v. Smith,* No. 5038 (Nye County Dist.Ct, Nev.1942) are contrary to Nevada law. As support for its argument, *amici* provide the affidavit of Mr. Michael Turnipseed, the State Engineer of Nevada and executive head of the Division of Water Resources. In that affidavit, Mr. Turnipseed testified that plaintiffs' court decrees do not confer an absolute right to the water claimed and that water rights under Nevada law receive conclusive effect only after the parties complete the statutory adjudication procedure.

In addition, defendant argues that plaintiffs' claim for interference with its ditch rights-of-way is not ripe because plaintiffs rights are not vested. Defendant concedes that a party could acquire a vested right of way under the Act of 1866 to transport water if the claimant completed ditch construction and began transporting water while the land was in the public domain. *See e.g., Bear Lake & River Waterworks & Irrig. Co. v. Garland,* 164 U.S. 1, 18–19, 17 S.Ct. 7, 11–12, 41 L.Ed. 327 (1896). Such a right-of-way is confined to the original alignment and scope of the right-of-way existing prior to the time when the land was reserved from the public domain. *See e.g., Union Mill & Mining Co. v. Dangberg,* 81 F. 73, 105 (C.C.D.Nev.1897).

According to defendant, plaintiffs do not possess vested ditch rights-of-way because they cannot testify to the validity of these ditches based upon personal knowledge of the original alignment and scope of the ditches constructed prior to 1907. Furthermore, defendant argues that plaintiffs are not competent to give an expert opinion on the status of the ditch rights-of-way prior to 1907. Therefore, because plaintiffs cannot prove that the present ditches are identical to the pre–1907 ditches and that plaintiffs own the right to use these ditches, defendant argues, plaintiffs' ditch rights-of-way taking claim cannot be ripe for adjudication until plaintiffs apply for a special use ditch permit and the Forest Service denies such a request. *See Williamson County Regional Planning Comm'n v. Hamilton Bank,* 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985) (party must submit an application for variance before claim can be considered ripe for review).

Defendant next argues that, even assuming *arguendo* that plaintiffs do own vested ditch rights-of-way, plaintiffs use of the ditches exceeds the scope of their property interest. Defendant notes that vested ditch rights-of-way under the Act of 1866 are subject to the Forest Service's regulations, including special use permits when necessary. *See* 43 U.S.C. § 1761(b)(3) and Part 2800. *See also Elko County Board of Supervisors v. Glickman,* 909 F.Supp. 759 (D.Nev.1995). According to defendant, the regulations allow "normal" maintenance of vested ditch rights-of-way including minor trimming and clearing of vegetative material within the right-of-way. Any other form of maintenance, beyond minor trimming, may be performed only with prior approval by the Forest Service through a special use permit. *See* 43 C.F.R. § 2801.1–1. Defendant argues that because plaintiffs' actions exceed "normal" maintenance, as determined by the Forest Service, plaintiffs must apply for a special use permit. Because plaintiffs have not sought such a permit to perform maintenance beyond the scope of their property right, plaintiffs' claim of a taking of their ditch rights-of-way is also not ripe.

In contrast, plaintiffs argue that defendant's ripeness argument is erroneous because plaintiffs can prove title to the water rights and ditch rights at issue and the continuous use of both until the rights were taken by the defendant. Plaintiffs claim that the stream adjudication does not prove who owns title to the water rights and is not a prerequisite to ownership of the water. According to plaintiffs, the stream adjudication does not perfect water right claims. Rather, it is a process to determine the quantity of water rights owned so that the state can

administer the water rights and prevent over-appropriating a stream.

Plaintiffs claim that Nevada law recognizes rights established prior to 1905 as vested water rights. Moreover, plaintiffs claim that Nevada courts recognize that vested water rights are outside the framework of statutory water law and are not affected by water laws enacted after 1905. *See In re Manse Spring,* 60 Nev. 280, 108 P.2d 311 (1940). Therefore, plaintiffs claim that because their water rights exist independent of the stream adjudication, the completion of the stream adjudication is not necessary for their claim to be ripe.

Furthermore, plaintiffs contend that they can prove by the two state court decrees, certificates of appropriation of water rights, surveys, deeds, and local custom and law that plaintiffs' predecessors in interest acquired vested water rights in the public lands prior to 1905 for stockwatering, irrigation and domestic purposes. Because plaintiffs can prove ownership of water rights prior to 1905, plaintiffs argue, they have vested water rights under Nevada law. *In re Manse Spring,* 108 P.2d at 311. By the Act of 1866, plaintiffs argue, defendant recognized all vested water rights on federal lands obtained by local custom and law. 43 U.S.C. § 661. Therefore, plaintiffs argue that they have requisite title to the water rights at issue and that their claim is ripe. In the alternative, plaintiffs claim that even if they do not have conclusive title, their numerous documents asserting ownership of the water rights create a factual issue regarding whether plaintiffs own the water rights and whether defendant's actions prevented plaintiffs from using their water rights.

Additionally, plaintiffs claim that their ditch rights-of-way claim is ripe for review. First, plaintiffs maintain that they can demonstrate ownership of vested ditch rights-of-way and that such ownership is recognized by state law and the Act of 1866. Plaintiffs claim that through historical documents and surveys they can establish original ditch construction and that the ditches are still maintained and operated in the same manner as the original ditch construction prior to 1907. Second, plaintiffs argue that their ditch rights-of-way were expressly excluded from the national forest and are outside the scope of Forest Service regulations.

Plaintiffs assert as a matter of law that forcing them to submit to the permit process itself constitutes a taking because it requires plaintiffs to exchange protected property rights for potential property rights. Plaintiffs claim that under the Act of 1866, there is no requirement that plaintiffs apply for or receive a special use permit to perform maintenance on their ditches. Plaintiffs argue that defendant's alleged authority over ditch rights-of-way does not alter rights granted to plaintiffs under the Act of 1866 for the use, maintenance, and operation of the ditch rights-of-way. Therefore, they claim that by preventing them access to the ditches, defendant has taken their property.

■ Under the ripeness doctrine, a federal court only can hear cases in which the litigants seek judicial intervention for actual governmental interference. In *Abbott Laboratories v. Gardner,* 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), the Supreme Court listed the two major criteria in deciding whether a case is ripe. First, a court must consider "the hardship to the parties of withholding court consideration" and, second, "the fitness of the issues for judicial decision." *Id.* at 149, 87 S.Ct. at 1515. Therefore, under the ripeness doctrine, this court is obligated to hear this case if the court determines that these plaintiffs will suffer real consequences if the court declines to consider their claims.

■ Plaintiffs claim that the alleged taking of their water and ditch rights-of-way in the Monitor Valley put their ranch out of business and stripped it of all economic value. Furthermore, plaintiffs claim that defendant is still using water which rightfully belongs to plaintiffs and they seek compensation for this alleged taking. On a motion for summary judgement, the court must accept these allegations as true in determining whether plaintiffs' water rights and ditch rights-of-way claims are ripe for review.

Contrary to defendant's argument, this court finds plaintiffs' claims ripe for review because plaintiffs have alleged real and con-

crete consequences resulting from current government action. The court has an affirmative obligation to hear these claims despite the Monitor Valley adjudication because the two proceedings are independent of one another. Moreover, the Monitor Valley stream adjudication began fifteen years ago and may take decades to complete. Such a delay would make a mockery of the Constitution's guarantee of both due process and just compensation. *See, e.g., Bowles v. United States,* 31 Fed.Cl. 37 (1994).

Defendant is correct that a taking cannot occur if the party alleging the taking cannot prove ownership of the property at issue. As discussed in the jurisdiction section, however, this court has jurisdiction to determine title regarding the water rights and ditch rights-of-way at issue.

Contrary to defendant's argument, the ripeness doctrine does not require that the adjudication be complete as a prerequisite to this court's exercise of jurisdiction.[9] Defendant and *amici* confuse determining title to water with the state's administrative procedure to determine the parameters of the allocated property interests in water rights. In Nevada, the water rights exist independent of the stream adjudication.

> Most water rights upon the streams of this state are undetermined by any judicial decree or other record. While the right exists, it is undefined. For the state, however, to administer such rights, it is necessary that they should be defined.

*Ormsby County v. Kearney,* 37 Nev. 314, 142 P. 803, 806 (1914). The Monitor Valley stream adjudication, therefore, does not determine who has title to the water rights at issue but defines the parameters of property interests in relation to other water rights. Using the analogy of land, the adjudication process determines the boundaries of the lot. The adjudication process does not determine whether the lot exists, as defendant and *amici* argue. Therefore, the concurrent adjudication of the Monitor Valley has no bearing on the ripeness of the claims before this court. To hold otherwise would be to deny

citizens of the United States the protection of the federal Constitution's guarantees and make those guarantees solely dependant upon state law. *Compare In re Slaughter–House Cases,* 83 U.S. (16 Wall.) 36, 21 L.Ed. 394 (1872) *with Allgeyer v. Louisiana,* 165 U.S. 578, 17 S.Ct. 427, 41 L.Ed. 832 (1897) *and Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). *See also Nollan v. California Coastal Commission,* 483 U.S. 825, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987); *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992); *Dolan v. City of Tigard,* —— U.S. ——, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994).

Furthermore, plaintiffs have presented various documents which at least present evidence of ownership of a property right to use an amount of water in the Toiyabe National Forest. Defendant and *amici* claim that such materials are inconclusive to prove title to the water rights relative to defendant's interest in the water. This may well be true, but it is not a matter to be resolved on a motion for summary judgement. It is a matter best decided at trial where both parties may present evidence and testimony, subject to cross examination, regarding the existence and the ownership of the property rights at issue.

■ The court also finds that plaintiffs' ditch rights-of-way claim is ripe for adjudication. Similar to the water rights taking claim, plaintiffs argue that defendant has prevented them from using and maintaining their ditch rights-of-way. Without access to the ditches, plaintiffs argue, they cannot use their water for feeding the cattle or for other domestic purposes. Plaintiffs claim that the direct result of defendant's interference with plaintiffs' ditch rights-of-way and the transportation of water was to force plaintiffs' ranch out of business and to sacrifice their vested water rights.

■ Defendant also argues that plaintiffs' taking claim is not ripe until plaintiffs apply for and are denied a permit to use the ditches because plaintiffs do not have vested

---

9. Title to water rights has monetary value independent of the adjudication procedure. In Nevada, parties have bought and sold unadjudicated

water rights for over a century. 1 S.V. Ciriacy–Wantrup, et al., *Water and Water Rights,* § 53.1 (Robert E. Clark ed., 1967).

rights. In the alternative, defendant argues that even if the rights are vested, plaintiffs exceeded the scope of their vested rights. Plaintiffs argue that the administrative procedure of applying for the permit is in itself a taking because the permit process denies plaintiffs their alleged vested ditch rights-of-way which they ask this court to enforce.

When confronted with administrative procedures, the ripeness doctrine requires that the relevant administrative agency reach a final decision that actually affects a plaintiff before a court will adjudicate a challenge to the agency's action. *See Abbott Labs. v. Gardner,* 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). Plaintiffs claim that by requiring them to apply for a FLMPA permit, the Forest Service is forcing them to forfeit their vested ditch rights-of-way. This argument was rejected by the Supreme Court in *United States v. Riverside Bayview Homes, Inc.,* 474 U.S. 121, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985). The Supreme Court stated, "[a] requirement that a person obtain a permit before engaging in a certain use of his or her property does not itself 'take' the property in any sense...." *Id.* at 127, 106 S.Ct. at 459. *Accord Tabb Lakes, Ltd. v. United States,* 10 F.3d 796 (Fed.Cir.1993). This court holds, therefore, that the requirement for plaintiffs to obtain a special use permit in compliance with the Forest Service's rules and regulations itself does not create a *per se* taking. *See also Gardner v. Stager,* 892 F.Supp. 1301 (D.Nev.1995) (permit required for maintenance of ditch rights-of-way in national forest).

Contrary to defendant's position, however, the law does not require plaintiffs to apply for a permit if the procedure itself is not a reasonable variance procedure, *see Loveladies Harbor, Inc. v. United States,* 15 Cl.Ct. 381, 386–387 (1988) (summary judgment denied), 21 Cl.Ct. 153 (1990), *aff'd* 28 F.3d 1171 (Fed.Cir.1994) (addressing variance procedures in a federal taking claim), and is so burdensome that it effectively deprives the property of value. *See Stearns Co. v. United States,* 34 Fed.Cl. 264 (1995). The case defendant cites for the proposition that plaintiffs must first seek a permit, *Williamson County,* does not apply to the pres-

ent facts. In *Williamson County,* the Supreme Court held that a taking claim is not ripe until the claimant seeks a variance from permit denial in claims arising from local zoning laws. This decision has been limited to those situations involving alleged violations of local and state zoning rules where an initial denial is not the end of the administrative process. *See, e.g., Loveladies Harbor, Inc. v. United States,* 15 Cl.Ct. 381, 386–387 (1988) (summary judgment denied), 21 Cl.Ct. 153 (1990), *aff'd* 28 F.3d 1171 (Fed.Cir.1994); *Culebras Enterprises Corp. v. Rivera Rios,* 813 F.2d 506, 515 (1st Cir.1987); *Littlefield v. City of Afton,* 785 F.2d 596, 609 (8th Cir. 1986).

Defendant used a similar ripeness argument, which this court rejected, in *Stearns Co. v. United States,* 34 Fed.Cl. 264 (1995). In *Stearns,* defendant argued that plaintiff's taking claim was not ripe until plaintiff sought, and was denied, a compatibility determination for subsurface mining on federal lands. Plaintiff claimed that the compatibility determination process itself was a taking because the process was so futile, or burdensome, that it effectively deprived the property of value. The court denied defendant's motion for summary judgment, allowing plaintiff the opportunity to prove at trial that a compatibility determination is not a reasonable variance type procedure and that the requirement to seek this procedure was so burdensome as to require compensation under the Fifth Amendment. This court determines, analogous to *Stearns,* that plaintiffs need not apply for a permit if plaintiffs can establish that the procedure to acquire a permit is so burdensome as to effectively deprive plaintiffs of their property rights. *See also Loveladies Harbor, Inc. v. United States,* 15 Cl.Ct. 381, 386–387 (1988) (summary judgment denied), 21 Cl.Ct. 153 (1990), *aff'd* 28 F.3d 1171 (Fed.Cir.1994).

Next, defendant claims that plaintiffs do not have the right to even try to demonstrate vested ditch rights-of-way because plaintiffs were not alive at the time of those rights' creation and therefore cannot prove that the present ditches are identical to those constructed prior to 1907. The court finds this argument untenable. Any

vested ditch rights-of-way constructed prior to 1907 did not die with the original owner. Property rights which attach to land are inheritable, devisable and transferable. Plaintiffs deserve the opportunity to prove at trial that they own rights to certain ditches and that these ditches are identical to those constructed prior to 1907 and used continuously since construction.

This court finds that plaintiffs have demonstrated that their water rights and ditch rights-of-way taking claims are ripe for review. At this stage of this litigation there is clearly a large factual component to the question of whether plaintiffs have a property interest in the water and ditches and whether defendant appropriated these rights without just compensation. Plaintiffs seek judicial review from this court under the Tucker Act for claimed actual damages caused by past and current government actions. Additionally, the court finds that denying plaintiffs the opportunity to bring their taking claims at this time would deny plaintiffs due process of law.

## III. MERITS OF MOTION FOR SUMMARY JUDGMENT ·

Pursuant to Rule 56(c) of the Rules of the United States Court of Federal Claims, defendant seeks summary judgment. In its complaint, plaintiffs argue three theories for recovery. First, plaintiffs claim that the grazing permit creates a binding contract between the parties which defendant has breached. Second, plaintiffs claim a taking of their property without just compensation. Third, plaintiffs seek compensation for improvements constructed in the Toiyabe National Forest. Defendant argues that it is entitled to judgment as a matter of law on each theory.

■ Rule 56(c) states that summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The party seeking to defeat a motion for summary judgment cannot rely on mere allegations to demonstrate the existence of material facts that would preclude summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The Supreme Court noted in *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986), that "[o]ne of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses." Thus, the nonmoving party must designate specific facts demonstrating a genuine issue for trial.

### A. Is a Grazing Permit a Contract?

■ In their complaint, plaintiffs allege that the grazing permit is a binding contract between the federal government and plaintiffs. In its motion for summary judgment, defendant claims that the issuance of a grazing permit does not as a matter of law create such a contract. Defendant bases its argument on two theories: 1) that the plain language of the permit clearly creates a license agreement, not a contract and 2) that Congress never delegated to the Forest Service the power to contract on behalf of the government with plaintiffs. As this issue is before the court on defendant's motion for summary judgment, the court must consider all facts in the light most favorable to the nonmovant; here the plaintiffs.

Defendant asserts that the plain language of the agreement indicates that the Forest Service and Congress intended the permit to constitute a license, not a contract, between the parties. Defendant argues that the permit is a license because it is a personal privilege which defendant may revoke. Defendant also notes that the Forest Service has broad discretion to suspend or cancel a permit and that such discretion is traditionally a quality found in a license, not a contract.

Even if the permit could appear to be a contract, defendant argues that the Forest Service had no authority to create a binding contract with plaintiffs. To support its argument, defendant relies on the Ninth Circuit's decision in *Osborne v. United States,* 145 F.2d 892 (9th Cir.1944) ("*Osborne*"). In *Osborne,* the government appropriated the national forest land on which plaintiff held

grazing privileges. *Id.* at 895. The plaintiff sought damages for the value of the grazing privileges based on the language of the relevant regulations, which stated: "A term permit shall have the full force and effect of a contract between the United States and the permittee." *Id.* (quoting 36 C.F.R. § 231.9). The Ninth Circuit held that such language could not be interpreted literally because Congress never gave the Department of Agriculture authorization to contractually bind the government by issuance of a grazing permit. The *Osborne* court stated:

> It is safe to say that it has always been the intention and policy of the government to regard the use of the public lands for stock grazing, ... as a privilege which is withdrawable at any time for any use by the sovereign without the payment of compensation.

*Id.* at 896. The Ninth Circuit interpreted the contract language to mean that the government would regard the terms of the permit as binding between the parties although the agreement did not create a contract. *Osborne,* 145 F.2d at 895. Defendant, relying on the *Osborne* decision, thus claims that the permit merely grants plaintiffs a license to graze. Defendant further argues that the Forest Service could not contract with plaintiffs since it did not have the authority to do so. Plaintiffs' mistaken belief that the permit contractually bound defendant is thus irrelevant.

Defendant further cites the Supreme Court case of *Buford v. Houtz,* 133 U.S. 320, 10 S.Ct. 305, 33 L.Ed. 618 (1890) (*"Buford"*), as the seminal case to support its argument that a grazing privilege never creates a contract. There the Court held that during the time period in question, before the creation of national forests and parks, the government granted all people an implied license to use the public lands for grazing. *Id.* at 326, 10 S.Ct. at 307. Since the decision in *Buford,* argues defendant, the privilege to graze on public lands has been considered a revocable license.

In contrast, plaintiffs argue that because the permit has all the "earmarks" of a contract: offer, acceptance and consideration— even a "contract number," the permit should be interpreted as a contract. The permit, claim the plaintiffs, creates mutual obligations and rights between the parties. In return for an exclusive right to graze, plaintiffs pay an annual grazing fee and agree to abide by defendant's regulations. Plaintiffs argue that the Forest Service also described the permits as contracts, administered the permits as contracts and enforced the permits as contracts. Plaintiffs therefore claim that this court must interpret the permit as a contract, not a license agreement.

After considering all factors most favorable to plaintiffs, the court concludes that as a matter of law the permit does not create a contract between the parties. First, the language and characteristics of the agreement are that of a license. Second, the Forest Service, as agent for the federal government, did not have the authority to contractually bind the government. Thus, the permit did not create contractual rights; rather, it merely granted plaintiffs certain exclusive privileges based upon historical grazing practices.

Plaintiffs' grazing permit has the traditional characteristics and language of a revokable license, not a contract. A contract creates legally enforceable rights and duties between the parties whereby the breach of such agreement gives rise to a remedy. Restatement (Second) of Contracts, § 1 (1981). In contrast, a license creates a personal or revokable privilege allowing a specific party to utilize the land of another for a specific purpose but does not vest any title or interest in such property in the licensee. Moreover, a party cannot transfer an interest in property with a license. *See* Arthur L. Corbin, 2 *Corbin on Contracts* § 404 (rev. ed. 1993). A contract, on the otherhand, is analogous to a lease (and in various circumstances the legal conceptions merge into one) and creates a vested property interest against the world. *See* Arthur L. Corbin, 3A *Corbin on Contracts* § 686 (1963 ed.).

The language of plaintiffs' grazing permit has few earmarks of a contract but many characteristics of a license. *See* Arthur L. Corbin, 2 *Corbin on Contracts* §§ 1.1–1.3, § 404 (rev. ed. 1993). Unlike a contract, the permit does not create affirmative obligations

on the part of the defendant. Similar to a license, defendant merely agrees to allow plaintiffs to graze cattle according to the permit terms for a period not exceeding ten years. Also similar to a license, plaintiffs cannot legally assign or transfer the permit, the permit creates a personal privilege for plaintiffs' individual use for the specific purpose of grazing cattle. Defendant may modify the permit because of "resource conditions or management needs." In fact, defendant reserved the right to cancel the permit in its totality if the government decides to devote the land for another public purpose incompatible with grazing. Based upon these factors, the court finds that the plain language of the grazing permit evidences no intention on behalf of the government to create a contract.

Contrary to plaintiffs' argument, the inclusion of a "contract number" to identify each grazing permit does not metamorphize the permit into a contract. Plaintiffs have not provided any documentation to support their position that the Forest Service had the requisite authority to enter into a grazing contract with plaintiffs. "Government's agents cannot contract to do that which they do not have a legal right to do." *Clawson v. United States*, 24 Cl.Ct. 366, 371 (1991); *see also Osborne v. United States*, 145 F.2d 892, 896 (9th Cir.1944). Even if plaintiffs believed the permit to be a contract and relied on the permit as a contract, Forest Service personnel cannot contractually bind the government without the proper legal authority.

The Supreme Court has never specifically addressed whether a grazing permit creates a contract between the government and the permittee. Of course, there is nothing in our legal theory that says what is called a permit may not in the eyes of the law be found to be a contract or vice versa. And, of course, Congress could turn these permits into contracts, leases or even fee estates, if it chose. Also, contrary to defendant's assertion, *Buford v. Houtz* did not address directly whether a *permit* created a contract. *Buford* addressed whether one private party could exclude another private party from grazing on public lands. The Supreme Court held that the government gave its tacit consent to such use of the public lands as a privilege to all people and no private party could alter that use. *Buford*, 133 U.S. at 326–27, 10 S.Ct. at 307–08.

Historically, federal courts have followed the analysis in *Buford* when confronted with grazing rights issues. Approximately thirty-five years after the *Buford* decision, Congress passed the Taylor Grazing Act and created specific grazing districts upon the public lands which required the issuance of exclusive permits for these grazing privileges. 43 U.S.C.A. §§ 315, et seq. Federal courts, confronted with these grazing permits, have considered the permit system to be an administrative method employed by the government to allow parties the exclusive right to graze based upon historical grazing practices. All the courts which have considered this issue have held or assumed such agreements to be licenses which confer certain privileges to the permittee, revokable at the government's discretion. *See, e.g., United States v. Fuller*, 409 U.S. 488, 93 S.Ct. 801, 35 L.Ed.2d 16 (1973); *Swim v. Bergland*, 696 F.2d 712 (9th Cir.1983); *Diamond Ring Ranch, Inc. v. Morton*, 531 F.2d 1397 (10th Cir.1976); *Fulton v. United States*, 825 F.Supp. 261 (D.Nev.1993). Plaintiffs have brought forth no persuasive arguments regarding why their grazing permit should be interpreted any differently from those grazing permits dealt with by other federal courts over a long period and held to be licenses.

Based upon the permit language, legal doctrine and precedent, the court finds that the permit at issue here is not a contract the breach of which may require damages. This court thus grants defendant's motion for summary judgment on this issue.

**B. Did Defendant Take Plaintiffs' Property Without Just Compensation?**

An analysis of plaintiffs' taking claims must begin with the language of the Fifth Amendment to the Constitution, which states, "[n]or shall private property be taken for public use, without just compensation." The Fifth Amendment requires that society as a whole, rather than a particular property owner, bear the burden of the exercise of

state power in the public interest. *Armstrong v. United States,* 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554 (1960); *Agins v. City of Tiburon,* 447 U.S. 255, 260–61, 100 S.Ct. 2138, 2141–42, 65 L.Ed.2d 106 (1980).

The right to just compensation is as fundamental a right as the right to vote and the right to free exercise of religion. *See Stearns Co. v. United States,* 34 Fed.Cl. 264, 271 (1995) citing *Dolan v. City of Tigard,* —— U.S. ——, ——, 114 S.Ct. 2309, 2320, 129 L.Ed.2d 304 (1994). At the heart of a free society is the ability of its citizens to own property and exclude others, including the government, from using that property. As Justice Story stated, "[t]he fundamental maxims of a free government seem to require, that the rights of personal liberty and private property should be held sacred." *Whitney Benefits, Inc. v. United States,* 18 Cl.Ct. 394, 399 (1989), *aff'd* 926 F.2d 1169 (Fed.Cir. 1991), *cert. denied* 502 U.S. 952, 112 S.Ct. 406, 116 L.Ed.2d 354 (1991), *citing Wilkinson v. Leland* 27 U.S. (2 Pet.) 627, 657, 7 L.Ed. 542 (1829). This mandate requires a court to determine "when and whether government's actions destroy the rights in property that are an essential component of ordered liberty." *Id.*

As taking jurisprudence has developed, the Supreme Court has interpreted the Constitution to prevent government from doing through general regulation what it is prevented from doing through direct specific action—taking private property for public use without just compensation.[10] *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922). Regulations, of course, can become so burdensome as to effectively result in the equivalent of a direct, physical appropriation of a property interest. As stated by the Supreme Court over one-hundred and fifty years ago in *M'Culloch v. Maryland,* 17 U.S. (4 Wheat) 316, 4 L.Ed. 579 (1819), "[a]n unlimited power to tax involves, necessarily, a power to destroy; because there is a limit beyond which no institution and no property can bear taxation."

*Id.* at 327. As Justice Holmes stated in *Pennsylvania Coal Co. v. Mahon,* if the government could regulate private property without restraint, "the natural tendency of human nature [would be] to extend the qualification more and more until at last private property disappear[ed]." *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 415, 43 S.Ct. 158, 160, 67 L.Ed. 322 (1922).

◼ Our first inquiry here is to determine whether, on defendant's motion for summary judgment, the court can find that plaintiffs have no property interest as a matter of law on undisputed facts. There generally is a heavy burden placed upon a summary judgment movant in a taking case because this category of claim is generally so fact intensive. *See Yuba Goldfields, Inc. v. United States,* 723 F.2d 884, 887 (Fed.Cir. 1983); *Brown v. United States,* 73 F.3d 1100 (Fed.Cir.1996). Property rights are generally defined by state law, though in certain cases federal property rights can be created. *See, e.g., Horne v. Adolph Coors Co.,* 684 F.2d 255 (1982) (patent is property interest created by federal law). Thus, our analysis must focus on whether, at this point, the court can say that plaintiffs clearly have no property interest under state law.

1. *Do Plaintiffs have a Property Interest in the Toiyabe National Forest or in Their Grazing Permit?*

◼ Plaintiffs concede in their complaint that the permit does not give them any right, title or interest in federal lands. Plaintiffs claim, however, that they have a property interest in the permit because the federal government issued the permit in recognition of rights which existed prior to the creation of the Toiyabe National Forest. Defendant claims that the issuance of a grazing permit, as a matter of law, does not create a compensable property interest under the Fifth Amendment. To support its position, defendant argues that Congress did not intend to create such a right by issuing grazing permits; that the permit does not have characteristics of private property; and that even if

---

**10.** It would appear that if no public use is involved, the federal government is bared both by the "just compensation" and the "due process"

clauses of the Fifth Amendment from taking at all and must return the property while paying just compensation for a temporary taking.

the permit creates value to the permittee, revocation of the permit is not compensable under the Fifth Amendment.

While Congress certainly could have created a property right in a grazing permit, defendant argues that Congress made absolutely clear its intent that grazing permits be classified as revocable licenses, whereby the issuance of such permits did not give rise to such property rights. Defendant stresses that both the Granger–Thye Act of 1950, 16 U.S.C. § 580*L*, and § 402(h) of FLMPA, 43 U.S.C. § 1752(h) expressly state that the issuance of a grazing permit does not grant "any right, title, interest or estate" in national forest land or resources.[11] The House Committee records stress the members' intention that the grazing permits reflect the use of the public land as a privilege, not a right. H.R.Rep. No. 1163. Finally, the Forest Service regulations, which specifically are incorporated into all grazing permits, also state that the issuance of a grazing permit does not convey "right, title, or interest held by the United States in any land or resources." 36 C.F.R. § 222.3(b).

Next, defendant claims that the rights given under the permit do not have the characteristics of private property but of a license. First, the grazing permit allows the Forest Service to suspend, cancel or modify a permit without compensation. Defendant cites the Ninth Circuit which held a grazing permit to be a revocable privilege "which is withdrawable at any time for any use by the sovereign without the payment of compensation." *Swim v. Bergland,* 696 F.2d 712, 719 (9th Cir.1983), citing *Osborne v. United States,* 145 F.2d 892, 896 (9th Cir.1944). Second, defendant notes that the permit cannot legally be bought or sold, a traditional characteristic of a property right. Third, the permit does not give plaintiffs the right to exclude all parties from the grazing allotment, also a traditional aspect of a right in real property.

Defendant also argues that although the grazing permit may have value to plaintiffs, the Fifth Amendment does not require compensation when defendant's actions affect the value of the permit or ranch because the sovereign itself created the value by issuing the grazing permit. *See, e.g., United States v. Fuller,* 409 U.S. 488, 491, 93 S.Ct. 801, 803–04, 35 L.Ed.2d 16 (1973). Although the permit may have value to plaintiffs, argues defendant, value itself does not create a compensable property right, no matter how seemingly unjust the consequences to plaintiffs. *See, e.g., United States v. Cox,* 190 F.2d 293, 295, (10th Cir.1951), *cert. denied* 342 U.S. 867, 72 S.Ct. 107, 96 L.Ed. 652 (1951).

To further support its position, defendant brings to the court's attention the case of *White Sands Ranchers of New Mexico v. United States,* 14 Cl.Ct. 559 (1988). In *White Sands,* plaintiffs claimed a compensable right to the value that the permit lands contributed to their fee ranches. The Claims Court found no such right, stating:

> It is settled law that grazing permits, though they are of much value to ranchers in the operation of an integrated ranching unit, nevertheless do no constitute property for purposes of the just compensation clause. *United States v. Cox,* 190 F.2d 293 (10th Cir.) cert. denied, 342 U.S. 867, 72 S.Ct. 107, 96 L.Ed. 652 (1951).... It has also been held that even as the grazing permits may not be assigned any compensable value in their own right, so neither may the market value which they contribute to private fee lands be recognized in the just compensation due upon the taking of the private lands. *United States v. Fuller,* 409 U.S. 488, 93 S.Ct. 801, 35 L.Ed.2d 16 (1973).

*Id.* at 566–67. Following from this, defendant argues that the Forest Service's decision to suspend and cancel part of plaintiffs' permit does not require compensation because the value given to plaintiffs by the right to graze on federal lands does not translate to a compensable property interest under any circumstances.

Plaintiffs give creative, though rather stretched, reasons why they have a compensable property interest in their grazing permit. Plaintiffs concede that the cases cited

---

11. Plaintiffs' permit was issued under the Granger–Thye Act which gave the Forest Service the authority to issue permits for grazing on national forest lands. 16 U.S.C. § 580 et seq.

by defendant do stand for the proposition that the mere issuance of a grazing permit does not grant any right, title or interest in the public lands. Plaintiffs claim that this rule does not apply to them for two reasons. First, plaintiffs argue that they have prior vested rights on the public lands which the grazing permit cannot effect; and, second, that a permittee may have a property interest in the permit even if a permittee does not have a property interest in the underlying rangeland.

Plaintiffs argue that they have a property right in the grazing permits, not because of the issuance of the permit *per se,* but due to a property right in the permit flowing from the Act of 1866, an independent act of the Congress. Plaintiffs contend that the permit embodies their underlying property right in the land and resources of the public lands conceded by the Act of 1866. Plaintiffs claim that the Act of 1866 merely enacted as federal law the custom and usage of the Western states and territories to recognize the rights of the first appropriator to acquire a priority right to the use and enjoyment of the public land over those who had not expended such labor. *See, e.g., Wyoming v. Colorado,* 259 U.S. 419, 460–61, 42 S.Ct. 552, 555–56, 66 L.Ed. 999 (1922), *vacated* 353 U.S. 953, 77 S.Ct. 865, 1 L.Ed.2d 906 (1957). Plaintiffs argue that their predecessors in interest conferred a benefit to the public lands by improving it and initiating an economically useful enterprise. Plaintiffs claim that Congress enacted the Act of 1866 as a "reward" with a recognition of property rights which their predecessor in interest had acquired in the rangeland.

After considering all factors most favorable to the plaintiffs, the court concludes that as a matter of law plaintiffs do not have a property interest in the permit or the rangeland themselves. To defeat defendant's motion for summary judgment, plaintiffs cannot rely on mere allegations to demonstrate a genuine issue for trial. Plaintiffs have failed to provide this court with facts to support their allegations of a property interest in the grazing permit or in the rangeland. Plaintiffs provide no logical support for the theory that Congress intended to create a property

right in the permit itself. In fact, the court can clearly determine, based upon the language and history of the Granger–Thye Act and the Taylor Grazing Act, that Congress had no legislative intention of creating a property interest in the permit just as Congress had no legislative intention of creating a property interest in the underlying federal lands.

Plaintiffs furnish no evidence supporting the existence of vested rights in the rangeland itself under the Act of 1866 or state law. In fact, all precedent indicates that the privilege to graze never created a property interest but rather a preference to use the allotment before the government gave the right to another. In other words, a preference grants a party the right of first refusal, not a property right in the underlying land. In *Wyoming v. Colorado,* 259 U.S. 419, 460–61, 42 S.Ct. 552, 555–56, 66 L.Ed. 999 (1922), *vacated* 353 U.S. 953, 954, 77 S.Ct. 865, 866, 1 L.Ed.2d 906 (1957), the Supreme Court did not determine that private parties had a property interest in the federal lands. Rather, the Supreme Court held that one who makes beneficial use of the public lands has a greater priority to the use of the that land than another private party who did not. *Id.* Likewise, the Act of 1866 did not "reward" parties with a recognition of property rights upon the rangeland. The Act clearly acknowledged vested rights in water and ditch rights-of-way according to state law. The Act does not address property rights in the public lands and the court declines to create such rights contrary to the clear legislative intention of Congress.

The Supreme Court, in *Alamo Land & Cattle Co. v. Arizona,* 424 U.S. 295, 96 S.Ct. 910, 47 L.Ed.2d 1 (1975) ("*Alamo* "), did find a possible compensable interest in the federal government's condemnation of a leasehold estate to graze held by a private party lessee and Arizona as lessor. The Supreme Court addressed Arizona law and the unique facts at issue, including a state *lease* to graze under the New Mexico–Arizona Enabling Act. *Alamo* does not create support for plaintiffs' assertion of property rights in the permit or the underlying rangeland. *Alamo,* however, does not endorse the legal theory,

nor can it be interpreted to find, that federal grazing permits are property rights. A lease and a permit are very different legal relationships. *See, e.g., United States v. General Motors Corp.*, 323 U.S. 373, 377, 65 S.Ct. 357, 359, 89 L.Ed. 311 (1945) (addressing property interest in a leasehold estate).

Moreover, value which the permit adds to the base property and reasonable expectations of private parties on the ability to graze upon public lands alone do not create a property interest. An interstate highway near a citizen's motel might make it far more valuable. The closing of such a highway in favor of a better route would hardly be considered a taking even though it might destroy the economic viability of the motel. The permit obviously adds value to plaintiffs' ranch and plaintiffs may have expected the option to renew the permit indefinitely. The court also understands that without a grazing permit, the ranch may become worthless. But the court emphasizes that plaintiffs' investment-backed expectations and reliance on the privilege to graze do not, in themselves, create a property interest in the rangeland or the permit.

The court finds no legal foundation to elevate plaintiffs' grazing permit to a property interest. Since plaintiffs have presented no documents or other facts or legal theories demonstrating any type of property interest in the public range or in their grazing permit, the court finds that plaintiffs do not have such a property interest. Because plaintiffs have no property interest in the rangeland or their permit, defendant's motion for summary judgment on this issue must be granted.

2. *Do Plaintiffs Have a Property Interest in Water Rights, Ditch Rights-of-way and Forage in the Toiyabe National Forest?*

In their complaint, plaintiffs allege ownership to all the water in the Meadow Canyon and Table Mountain allotments,[12] to certain ditch rights-of-way and the forage in the Meadow Canyon and Table Mountain allotments. Plaintiffs claim that through physical actions and regulations defendant has taken these property rights without just compensation. Defendant argues that even if this court determined that it did have jurisdiction and that plaintiffs' claims are ripe, plaintiffs do not own the property interest in the public lands which they allege. Because plaintiffs do not have the requisite property interest, defendant argues, the court must grant its motion for summary judgment because plaintiffs' have failed to meet their burden of demonstrating a genuine issue for trial.

The court denies defendant's motion for summary judgment regarding plaintiffs' water rights, ditch rights-of-way and forage taking claims. As discussed in the jurisdiction and ripeness sections, the court finds that plaintiffs have presented sufficient documentation of ownership of water rights, ditch rights-of-way, and forage to proceed with these taking claims. At the limited evidentiary hearing, the court will determine if plaintiffs do have the property interests which they allege and over which a disputed issue of material fact exists.

a) *Water Rights*

Defendant and *amici* present three theories why plaintiffs cannot prove the requisite ownership of water rights in the Toiyabe National Forest. First, defendant implies that plaintiffs cannot have ownership of water on federal lands. Second, defendant and *amici* argue that even if plaintiffs have a right to some of the water, that right does not encompass all of the water claimed by plaintiffs. Third, defendant and *amici* claim that defendant never appropriated plaintiffs' water rights for the government or third party use or denied plaintiffs access to their alleged water rights. Since the United States did not deny plaintiffs the use of their alleged water rights, contends defendant and *amici*, plaintiffs' water rights taking claim must be dismissed. In other words, unless defendant and other third party users drank the streams dry, thereby preventing plain-

12. Specifically, plaintiffs claim water rights in the Toiyabe National Forest from Meadow Canyon Creek, Punch Bowl Spring, McMonigal Spring, North Umberland, Bach Spring, Pablo Canyon Creek, Warm Springs, Barley Creek, Corcoran Creek, Raltson Valley–Antelope Spring, Pine Creek Well, and Stone Cabin Valley–Salisbury Well.

tiffs from obtaining any water, plaintiffs cannot argue a taking occurred.

*Amici* adds another dimension to the water rights issue. They contend that water rights are not similar or analogous to traditional property rights subject to the just compensation requirement of the Fifth Amendment. *Amici* argue that water rights are limited, usufructuary rights which do not entitle the appropriator to actual possession or ownership of water, but only to the right to put a certain quantity of water to beneficial use.

■ Determining title to this type of water right and the scope of the water right is an issue of first impression in this court. Flowing water presents unique ownership issues because it is not amenable to absolute physical possession. Unlike real property, water is only rarely a fixed quantity in a fixed place. Nevertheless, the right to appropriate water can be property right. *See, e.g., Wyoming v. Colorado,* 259 U.S. 419, 460–61, 42 S.Ct. 552, 555–56, 66 L.Ed. 999 (1922), *vacated on other grounds* 353 U.S. 953, 77 S.Ct. 865, 1 L.Ed.2d 906 (1957); *In re Manse Spring,* 60 Nev. 280, 108 P.2d 311 (1940). *Amici* provides no reason within our constitutional tradition why water rights, which are as vital as land rights, should receive less protection. This is particularly true in the West where water means the difference between farm and desert, ranch and wilderness, and even life and death. This court holds that water rights are not "lesser" or "diminished" property rights unprotected by the Fifth Amendment. Water rights, like other property rights, are entitled to the full protection of the Constitution.

The issues which this court must determine are: what water rights do plaintiffs own, if any, which could be subject to a taking? And, whether under the facts presented, did government regulation of water usage in the Toiyabe National Forest effectively take plaintiffs' water rights? Under 16 U.S.C. § 481, the use of water within national forests is subject to regulation. *See* 36 C.F.R. 251.53(*l*)(1). As demonstrated, the parties strongly disagree regarding whether plaintiffs own any water rights, the scope of

those rights, and the ability of the Forest Service to regulate the alleged water rights.

Defendant first argues that plaintiffs cannot claim water rights superior to defendant's upon federal lands. This allegation is incorrect. The Act of 1866 clearly acknowledges vested water rights on public lands. The Act states in relevant part:

Whenever, by priority of possession, rights to the use of water for mining, agricultural, manufacturing, or other purposes, have vested and accrued, and the same are recognized and acknowledged by the local customs, laws and decisions of courts, the possessors and owners of such vested rights shall be maintained and protected in the same....

43 U.S.C. § 661. Also, the Supreme Court, has acknowledged that private parties may acquire water rights on federal lands. *See, e.g., Broder v. Natoma Water and Mining Co.,* 101 U.S. 274, 276, 25 L.Ed. 790 (1879) (water rights on public lands are rights "which the government had ... recognized and encouraged and was bound to protect"); *Central Pac. Ry. Company v. Alameda County, California,* 284 U.S. 463, 52 S.Ct. 225, 76 L.Ed. 402 (1932).

■ The Act of 1866 states that priority of possession to the rights of water on federal lands will be determined by local law. Nevada has adopted the prior appropriation doctrine for the administration of water rights. Under this system, the date of the appropriation determines the appropriator's priority to use the water, with the earliest user having the superior right. *See Humboldt Land & Cattle Co. v. Allen,* 14 F.2d 650 (D.C.Nev.1926), *aff'd* 274 U.S. 711, 47 S.Ct. 574, 71 L.Ed. 1314 (1927). The date the water right was first put to beneficial use is extremely important because available water is distributed according to priority rather than being apportioned among all users. Plaintiffs will have the opportunity at trial to prove vested water rights appropriated before defendant acquired water rights in the Toiyabe National Forest. Subject to reasonable regulation, if plaintiffs' water rights have priority over defendant's rights, plaintiffs, as senior appropriators, have a right to utilize their total volume of water before

defendant has any right to utilize their water rights. 43 U.S.C. § 661 (water rights vested under local law are protected).

Second, the court disagrees with defendant's and *amici's* position that plaintiffs cannot have a vested right to all the water in certain areas of the Toiyabe National Forest. Nevada law allows a party to appropriate any amount of water, including the entire flow of a spring, to be put to beneficial use. Nev. Rev.Stat. § 533.030 states in relevant part, "[r]ights to the use of water are restricted to the amount which is necessary for irrigation and other beneficial purposes. Nev.Rev.Stat. § 533.060. A water user does not have the right to the entire flow of a stream or spring *unless* that entire flow is being put to beneficial use." *Id.* (emphasis added). The court concludes that, under the cited Nevada law, plaintiffs could have vested rights to put each spring and stream to beneficial use.

The court further finds defendant's and *amici's* argument denying appropriation of plaintiffs' alleged water rights to be illogical and circular. Plaintiffs argue that if defendant had not interfered with plaintiffs' alleged priority water rights, plaintiffs would have put the water to beneficial use. For example, plaintiffs claim that defendant installed a water supply system for an administrative site at a spring whose water is owned by plaintiffs, allowed non-indigenous elk to drink water claimed by plaintiffs, and prevented plaintiffs from access to their water.

Defendant cannot logically argue under such circumstances that plaintiffs alleged water rights were not taken because plaintiffs never used the water. Obviously, plaintiffs could not make beneficial use of their water rights if they were prevented from doing so because someone else already utilized the water. Defendant's argument reminds the court of the old story of the person who killed his parents and then claims the sympathy of the court because he is an orphan. The only difference is in this case the prosecutor is doing the killing and using the issue of orphanage to discriminate against the orphan! The court finds that whether defendant utilized plaintiffs' water for its use and for the use of third parties or prevented plaintiffs access to their water rights are

questions of fact to be addressed in determining whether there has been a taking.

Finally, the court does not accept defendant's "no denial of access" argument as a reason to grant summary judgment. Defendant argues that until plaintiffs apply for and are denied the right to change the place of diversion, defendant has not taken plaintiffs' water by denying access. The court finds implausible the concept that plaintiffs should be required to apply for a change of place of diversion before bringing their claim. Plaintiffs specifically argue that their water right includes the right to use the water at specified locations. Plaintiffs will have the opportunity at trial to demonstrate that in Nevada, water rights include the right to use the water at certain locations without creating ditch pipelines.

The court declines to grant defendant's motion for summary judgment regarding plaintiffs water rights taking claim. The court has studied the voluminous filings to support defendant's and *amici's* position that plaintiffs own no property which defendant could have taken. This court concludes that plaintiffs have demonstrated enough facts indicating ownership of water rights, which defendant may have used, to allow plaintiffs to proceed with their taking claim at this stage of the proceedings. The court will hold a limited evidentiary hearing at which time plaintiffs and defendant may present evidence and testimony regarding ownership of water rights and the scope of that property right in Nevada.

b) *Ditch Rights-of-way*

Defendant argues that even if the court finds plaintiffs' ditch rights-of-way taking claim ripe, defendant did not take plaintiffs ditch rights as a matter of law. Defendant argues that even assuming that plaintiffs have valid ditch rights-of-way protected under the Act of 1866, the Forest Service may regulate and restrict activities beyond the scope of normal maintenance and repair. *See* 43 C.F.R. § 2801.1. Therefore, because plaintiffs activities went beyond "normal" maintenance, argues defendant, defendant acted properly and reasonably by regulating plaintiffs' actions on the public lands. In

contrast, plaintiffs claim that defendant imposed unreasonable conditions on access and maintenance of plaintiffs ditch rights.

■ As discussed in the ripeness section, if this court concludes that plaintiffs own certain ditch rights-of-way pursuant to the Act of 1866, it is the court's role to determine the scope of that property right. According to the Forest Service Manual § 5522.1(4), a permit is not required for plaintiffs to perform "normal maintenance or minor changes made in the facilities on the right-of-way to maintain capacity of the ditch as it existed on October 21, 1976." The scope of the property right in the ditch rights-of-way are determined by referring to state law and interpreting the applicable regulations.

■ Plaintiffs will have the opportunity at the evidentiary hearing to prove their ownership of vested ditch rights and that their desired use and maintenance of these rights does not exceed the scope of their property interest, requiring a special use permit. If plaintiffs establish both facts, then the court will permit plaintiffs' ditch rights-of-way taking claim to proceed.

### c) Forage

■ In their complaint, plaintiffs contend that the right for their cattle to graze is linked to their vested water right under the Act of 1866 and state law. Defendant argues that as a matter of law, plaintiffs' alleged vested water rights do not grant plaintiffs the right to "bootstrap" an interest in adjacent federal lands and resources. Defendant acknowledges that a stockwatering right is premised on the ability to graze stock and put the water to beneficial use and that if defendant revokes the grazing permit the stockwatering right will be worthless.

Defendant also notes that courts consistently have held that an easement to graze on public lands does not attach to a water right on public lands. The Supreme Court unequivocally determined grazing on the public lands to be a privilege, revokable at the government's will. *See, e.g., Buford v. Houtz,* 133 U.S. 320, 10 S.Ct. 305, 33 L.Ed. 618 (1890); *Light v. United States,* 220 U.S. 523, 31 S.Ct. 485, 55 L.Ed. 570 (1911);

*Omaecheverria v. Idaho,* 246 U.S. 343, 38 S.Ct. 323, 62 L.Ed. 763 (1918); *United States v. Fuller,* 409 U.S. 488, 93 S.Ct. 801, 35 L.Ed.2d 16 (1973). The Nevada Supreme Court also assumed grazing on public lands to be some type of "implied license," noting that a grazing privilege is not a right conferred by the federal government and that the use of the public range may at any time be withdrawn from such use. *Itcaina v. Marble,* 56 Nev. 420, 55 P.2d 625 (1936). The Supreme Court of Nevada also determined in *Ansolabehere v. Laborde,* 73 Nev. 93, 310 P.2d 842 (1957), that those aspects of the Nevada Stockwatering Act concerning the control of grazing privileges on the public lands were superseded by the Taylor Grazing Act. *Id.* at 102, 310 P.2d 842.

Finally, defendant cites a recent analogous case from the district court of Nevada, *Gardner v. Stager,* 892 F.Supp. 1301 (D.Nev.1995). Plaintiffs brought suit to "quiet title" to alleged grazing and water rights in the Humboldt National Forest. The district court noted that plaintiffs' claim to vested grazing rights "are directly contradicted by an unbroken line of Supreme Court precedent." *Id.* at 1304. Also, the court found that although plaintiffs' predecessors in interest grazed stock on the land at issue for more than eighty years, this use did not give plaintiffs a vested grazing right immune from federal regulation. The court held that grazing remains a privilege, subject to regulation by the federal government and revocable at any time. *Id.* at 1303.

Defendant notes that the United States does not need to compensate private parties for the reduction in value of adjacent private property when the Forest Service cancels or suspends grazing privileges. Defendant emphatically argues based upon precedent and persuasive authority that the ability to graze on national forest lands is a privilege, not a right. Defendant claims that in no manner could plaintiffs acquire a property interest in the ability to graze on public lands. Therefore, defendant could not "take" plaintiffs' grazing rights because plaintiffs never had a property interest in their privilege to graze.

Plaintiffs present a novel argument regarding how and why they have vested graz-

ing rights in the Toiyabe National Forest despite the overwhelming cases finding no such right. Under the Act of 1866, plaintiffs note, Congress provided that the right to use water which has vested and accrued and is recognized and acknowledged by local customs and law shall be maintained and protected. 43 U.S.C. § 661. The Act of 1866 instructs courts to apply state law to determine title and scope of water rights. Plaintiffs assert that in Nevada the right to bring cattle to the water, and for cattle to consume forage adjacent to a private water right, is inherently part of the vested stockwater right. Obviously, there is some logical support for this proposition even in light of the small amount of knowledge of bovine behavior held by the court.

Plaintiffs claim that the right to use water on the public lands and the right to graze under Nevada law "are inextricably intertwined." Cattle graze on the public range because water exists on the public lands. The cattle will roam and drink from all available water sources and consume forage near the water source. Plaintiffs argue that Nevada law recognizes this fact in its water code which refers to "rights to water range livestock at a particular place" and to the "watering place." NRS §§ 533.485–.510. Plaintiffs further argue that Nevada courts also considered water and grazing rights as combined interests. The Nevada Supreme Court in *Ansolabehere v. Laborde*, 73 Nev. 93, 310 P.2d 842 (1957), *cert. denied* 355 U.S. 833, 78 S.Ct. 51, 2 L.Ed.2d 45 (1957), held that "the right to the use of water for watering livestock in this arid state depends for this value on the public range; hence we think the two matters are properly connected." *See also In re Calvo*, 50 Nev. 125, 253 P. 671 (1927). Thus, plaintiffs claim that under Nevada law, their vested water right, as acknowledged by the Act of 1866, includes the right for the cattle to consume forage adjacent to the water.

The court agrees with defendant that each case it cites stands for the general proposition that the right to graze is a revocable privilege. The court also agrees with defendant and the numerous courts which have addressed this issue, that plaintiffs do not have a property interest in the rangeland. The court also agrees that defendant may revoke grazing privileges which in reality prevent plaintiffs from the beneficial use of the stockwatering rights. Nevertheless, neither the Supreme Court, or other lower federal courts, have addressed the *scope* of the water rights acknowledged by the Act of 1866. If Nevada law recognized the right to graze cattle near bordering water as part of a vested water right before 1907, when Congress created the Toiyabe National Forest, plaintiffs may have a right to the forage adjacent to their alleged water rights on the rangeland.[13]

The court notes that Nevada has addressed the conflict between the role of the state to define water rights and the role of the federal government to manage, regulate and control national forests. The Nevada courts, however, did not address whether Nevada law prior to the creation of the Toiyabe National Forest from the public domain directly granted the right to utilize forage appurtenant to a water right. In fact, the Nevada Supreme Court cases of *In re Calvo*, *Ansolabehere v. Laborde* and *Itcaina v. Marble*, demonstrate the conflict over the right to graze versus the right to use water on public lands. *See In re Calvo*, 50 Nev. 125, 253 P. 671 (1927), *Ansolabehere v. Laborde*, 73 Nev. 93, 102, 310 P.2d 842 (1957), and *Itcaina v. Marble*, 56 Nev. 420, 55 P.2d 625 (1936) (state regulates water rights on federal lands and regulated grazing on the federal lands until the enactment of the grazing acts at which time Nevada continued to regulate the water on federal lands while the federal government regulated the right to graze.)

When the federal government created the Toiyabe National Forest, it could not unilaterally ignore private property rights on the public domain. If Congress wanted to remove all private property interests in the public domain, which were created by the

---

**13.** If plaintiffs prove a right to the use of the forage, then plaintiffs may have a valid taking claim regarding the elk if plaintiffs can demonstrate (1) that the Forest Service had no legal right to permit non-indigenous elk on plaintiffs' allotment and (2) if plaintiffs can demonstrate that the elk actually consumed forage to which plaintiffs' cattle were entitled.

state under state law, the Constitution would have required the federal government to pay just compensation. Just as the federal government could not take private property rights in water or ditch rights-of-way when it created the Toiyabe National Forest, the government could not take any other form of private property right in the public domain. Plaintiffs will have the opportunity at trial to prove property rights in the forage stemming from the property right to make beneficial use of water in the public domain within Nevada originating prior to 1907.

### 3. Did Defendant's Impoundment of Plaintiffs' Cattle Qualify as a Compensable Taking Under the Fifth Amendment?

■ In their complaint, plaintiffs allege that defendant took their cattle without just compensation. Specifically, plaintiffs argue that this is not a case of a simple trespass of plaintiffs' cattle caused by plaintiffs' carelessness. Rather, plaintiffs allege that defendant was able to impound and sell their cattle only because it made demands under the permit which defendant knew plaintiffs could never satisfy as well as physically opened gates, causing the cattle to wander to the suspended allotment. Defendant argues that summary judgment is appropriate because (1) this court is not the proper forum to review defendant's actions; (2) plaintiffs' cattle were trespassing and (3) plaintiffs "essentially" consented to defendant's actions by failing to retrieve their cattle.

Defendant claims that its actions under the permit, as administrative actions, cannot be reviewed by this court. As defendant notes, plaintiffs did object to defendant's actions and sought administrative appeals through the Forest Service's administrative review. After exhausting administrative review, however, plaintiffs did not seek judicial review of defendant's actions. Therefore, if plaintiffs want to argue that the Forest Service's ac-

tions were improper under the permit, plaintiffs must seek review in the proper forum, the district court. To proceed in this court, defendant argues, plaintiffs must accept defendant's actions as lawful and proper. *See Florida Rock Indus. v. United States,* 791 F.2d 893, 898–99 (Fed.Cir.1986), *cert. denied,* 479 U.S. 1053, 107 S.Ct. 926, 93 L.Ed.2d 978 (1987).

Defendant argues that by signing the grazing permit, plaintiffs authorized the impoundment and sale of their cattle. The permit specifically incorporates the Forest Service regulations permitting impoundment and sale of livestock under specific conditions. Defendant argues that under 36 C.F.R. § 262.10,[14] the unauthorized pasturing of cattle on a national forest constitutes a tort and trespass. When cattle are found on federal lands improperly, the cattle may be seized and sold under 16 U.S.C. § 551[15] and applicable regulations.

Pursuant to plaintiffs' grazing permit and the relevant regulations, defendant argues that plaintiffs' cattle were trespassing on federal lands and that defendant, as the landowner, had a right to confiscate the cattle. *See United States v. Gardner,* 903 F.Supp. 1394 (D.Nev.1995). For example, after the Forest Service suspended plaintiffs' right to graze on the Meadow Canyon allotment, defendant claims that any grazing by plaintiffs' cattle constituted a trespass. Defendant argues that when it observed plaintiffs' cattle grazing on the Meadow Canyon allotment during the suspension, it gave plaintiffs numerous opportunities to remove their cattle. Defendant claims that plaintiffs failed to remove the cattle, and, as a landowner, defendant had the right to remove the cattle itself when plaintiffs failed to comply with the Forest Service's instructions. *See United States v. West,* 232 F.2d 694, 698 (9th Cir.1956), *cert. denied* 352 U.S. 834, 77 S.Ct. 51, 1 L.Ed.2d 53 (1956), quoting *Camfield v. United States,* 167 U.S. 518, 524, 17 S.Ct. 864, 866–67, 42

---

**14.** 36 C.F.R. § 262.10 provides that "[u]nauthorized livestock or livestock in excess of those authorized by a grazing permit on the National Forest System, which are not removed therefrom within the periods prescribed by this regulation, may be impounded and disposed of by a forest officer as provided here."

**15.** 16 U.S.C. § 551, part of the 1897 Organic Act, grants the Secretary of Agriculture the authority to make such rules as are necessary to regulate the occupancy and use of the national forests for their protection.

L.Ed. 260 (1897) (the United States has "the rights of an ordinary proprietor to maintain its possession and to prosecute trespassers.")

Plaintiffs are estopped from claiming a taking based upon the impoundment and sale of their cattle, argues defendant, because the Forest Service notified plaintiffs at every point of the process. Defendant argues that plaintiffs "essentially" consented to the sale of the cattle by the terms of their permit and then by failing to redeem their cattle from the Forest Service. Defendant notes that after the impoundments, defendant gave plaintiffs an opportunity to redeem their cattle before auction. Defendant also notes that it sent plaintiffs numerous warnings that their cattle were trespassing and that if plaintiffs did not remove their cattle, defendant would impound them. Defendant argues that "this Court has never required the state to compensate the owner for the consequences of his own neglect." *Texaco, Inc. v. Short,* 454 U.S. 516, 530, 102 S.Ct. 781, 792, 70 L.Ed.2d 738 (1982). Defendant argues that a taking cannot occur when the Forest Service merely followed their regulations which plaintiffs agreed to follow when they signed their grazing permit.

Plaintiffs seek just compensation for the impoundment and sale of their cattle by claiming, consistently and forcefully, that the Forest Service knowingly created an environment that made it economically and practically infeasible to manage the cattle on the allotments. Plaintiffs argue that the Forest Service intentionally made demands and conditions under the permit that the plaintiffs could not satisfy including establishing deadlines which were inherently impossible to meet for moving cattle onto and off of the allotments. For example, plaintiffs argue that the presence of their cattle on the Meadow Canyon allotment during the suspension and plaintiffs' inability to move the cattle were caused by the interference of defendant with the allotment itself and through regulatory schemes. Plaintiffs also claim that they could not redeem the cattle because defendant's actions made plaintiffs' economic operation of the ranch impossible. Plaintiffs contend that defendant's actions were designed to interfere with plaintiffs' allotments and operation of their ranch thereby causing plaintiffs to lose their grazing permit and the use of their stockwatering rights. Plaintiffs argue that just compensation is required because defendant's created a situation whereby they knew plaintiffs could not prevent their cattle from moving onto the Meadow Canyon allotment during the suspension and therefore guaranteed the confiscation and sale of plaintiffs' property.

■ The court determines that genuine issues of material fact exist regarding the impoundment and sale of the cattle which prevent the court from granting defendant's motion for summary judgment. This court agrees with defendant that plaintiffs must concede all actions as proper under the permit to bring a taking claim. This court is not the proper forum to question defendant's actions under the permit. Defendant, however, goes one step further. Defendant claims that because plaintiffs admit that defendant exercised its rights under the regulations and permit, defendant's actions cannot cause a taking of plaintiffs' property. This argument is not correct. A taking occurs when government, acting within its statutory powers, infringes upon a party's property rights. *See Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992); *Loveladies Harbor, Inc. v. United States,* 15 Cl.Ct. 381, 386–387 (1988) (summary judgment denied), 21 Cl.Ct. 153 (1990), *aff'd* 28 F.3d 1171 (Fed.Cir.1994); *Whitney Benefits Inc. v. United States,* 18 Cl.Ct. 394 (1989), *aff'd* 926 F.2d 1169 (Fed. Cir.1991), *cert. denied* 502 U.S. 952, 112 S.Ct. 406, 116 L.Ed.2d 354 (1991).

The government's argument confuses two different concepts. The first is that the Tucker Act and the Fifth Amendment provide a property owner a remedy for an authorized government action that "takes" private property. The second is that the Administrative Procedure Act, 5 U.S.C. § 701 et seq., provides district court review of government actions or regulations that go beyond the scope of the law. Here, since the plaintiffs did not challenge the government action in district court, the government suggests that the action must be lawful and cannot be a taking. This is

not what *Loveladies Harbor* teaches. *See Loveladies Harbor, Inc. v. United States,* 15 Cl.Ct. 381, 386-387 (1988) (summary judgment denied); 21 Cl.Ct. 153 (1990), *aff'd* 28 F.3d 1171 (Fed.Cir.1994). While the seizure under the permit restrictions cannot be a taking, plaintiffs' argument is that the alleged governmental actions that led to the permit being violated were a taking. Under this view, the seizure under the permit is merely the measure of damages of the taking, it is not the claimed taking. This claim *cannot* be resolved against plaintiffs on summary judgment but must be answered at trial.

Plaintiffs must demonstrate that defendant's total actions, although the final seizure was permitted by regulation, caused a taking without compensation. Unlike the issue of water rights, ditch rights-of-way and forage, the scope of the property rights in the cattle is easily ascertainable. Plaintiffs owned cattle which allegedly were trespassing on federal lands which defendant confiscated and sold. Plaintiffs appear to argue that defendant took their cattle by regulation and by physically inducing the cattle to graze on the Meadow Canyon allotment during the suspension period. Plaintiffs also argue that defendant created a situation where it was physically and economically impossible to prevent their cattle from wandering and to redeem their cattle after impoundment. Plaintiffs argue that the creation of this environment caused a taking which otherwise would not have occurred. The seizure of the cattle was the effect of the taking and its measure of damages. Plaintiffs must demonstrate that despite the regulations and permit terms and despite the warnings and opportunities to redeem their cattle, defendant's actions still constituted a taking.

Addressing plaintiffs' taking claims, the court concludes that a limited initial evidentiary hearing is necessary to address the mixed questions of fact and law regarding the property interests claimed by plaintiffs in the water rights, forage and ditch rights-of-way. These property rights issues will determine whether a taking analysis is needed. If plaintiffs prove prior vested rights in the water, encompassing forage rights and vested ditch rights-of-way, plaintiffs are entitled to proceed to the taking issue. If no property rights are found then these claims must be dismissed. The issue of whether defendant's confiscation of plaintiffs' cattle qualifies as a taking will be addressed following the property rights hearing stage.

## C. Are Plaintiffs Entitled to Compensation for Improvements Made to the Toiyabe National Forest Pursuant to 43 U.S.C. § 1752(g)?

In their complaint, plaintiffs claim compensation for authorized permanent improvements constructed by them on their allotments because defendant cancelled their permit to devote the allotments to another public purpose. Defendant argues that the partial cancellation of plaintiffs' permit was not done to devote the rangeland for another public purpose, but rather, to enforce the terms and conditions of the permit and to protect the range.

Plaintiffs claim that defendant's argument is merely a pretext to cancel plaintiffs' permit and devote the range to another public purpose without compensating plaintiffs' for the value of their improvements.[16] First, plaintiffs claim that the five-year suspension of all grazing on the Meadow Canyon allotment was a *de facto* cancellation of the permit because the suspension extends past the expiration of the permit.[17] Second, plaintiffs allege that defendant did not cancel the permit to enforce compliance with the permit terms, but rather, to "protect and preserve the national forest so that other uses of the forest may be expanded or added." For example, plaintiffs contend that the Forest Service intends to use the allotment to "ranch elk" in an effort to improve the local economy by generating hunting license fees and that the Forest Service's real goal is to preserve the forest in a "pristine" condition

---

16. Under 43 U.S.C. § 1752(g), a party is entitled to compensation for the value of improvements constructed on the rangeland when the government devotes the land to another public purpose.

17. In 1991, defendant also cancelled 38% of the cattle permitted on the Meadow Canyon allotment.

to maximize its value to environmentalists, fishermen and recreationalists.

Defendant argues that plaintiffs do not qualify for compensation under 43 U.S.C. § 1752(g) for three reasons. First, defendant claims that it cancelled 25% of the Table Mountain and 38% of the Meadow Canyon allotments because of plaintiffs' "persistent violations" of the terms and conditions of their permit. Second, defendant argues that the allotments have not been devoted to another public purpose because cattle grazing continues to be one of the *multiple* uses of the range. Therefore, defendant claims a reduction in the permitted number of cattle allowed to graze does not qualify as changing the use of the range. Third, even if this court determines that the range has been devoted to another public purpose, plaintiffs are not entitled to compensation because, under the terms of the permit, all improvements are the property of the federal government.

The court must determine whether, on defendant's motion for summary judgment, it can find that defendant did not devote the rangeland to another public purpose as a matter of law on undisputed facts. Defendant argues, however, that even if this court finds that defendant did devote the land to another public purpose when it cancelled plaintiffs' permit, plaintiffs do not own the property at issue and therefore no compensation is due. Defendant provided in its brief a partial section of the relevant portion of plaintiffs' grazing permit which states:

> The permanent improvements constructed, or existing for use, in conjunction with this permit are the property of the United States Government, unless specifically designated otherwise, or covered by a cooperative agreement. They will not be removed, nor compensated for upon cancellation of this permit ...

Defendant, however, *neglected* to mention the rest of the sentence which states that parties will *not* be compensated for improvements on the rangeland "*except* in the National Forests in the 11 contiguous western states when cancelled in whole or in part to devote the land to another public purpose." (emphasis added). Therefore, contrary to defendant's position,[18] plaintiffs are entitled to compensation if defendant cancelled the permit in part to devote the land to another public purpose because plaintiffs' allotments are part of the Toiyabe National Forest.

The court notes that plaintiffs' claim for compensation under 43 U.S.C. § 1752(g) is nearly identical to their taking claims. Under both claims, plaintiffs consistently allege that defendant wants plaintiffs to forfeit their grazing and water rights so that the Forest Service may devote the land and water rights to another public purpose. For example, plaintiffs allege that defendant prevented their access to the water and ditches to allow third parties and the Forest Service to use the water. Regarding plaintiffs' forage claim, plaintiffs allege that defendant cancelled the permit in part to allow the elk to graze and drink on the Table Mountain and Meadow Canyon allotments. Regarding their cattle taking claim, plaintiffs allege that defendant created conditions which it knew plaintiffs could not satisfy to force plaintiffs to forfeit their cattle and grazing permit.

Plaintiffs, however, do not need to prove a taking to receive compensation under 43 U.S.C. § 1752(g). To prevail, plaintiffs must demonstrate that first, defendant actually cancelled the permit not to enforce the permit terms but rather to have access to the water and allotments for use by the Forest Service, elk, hunters, fishermen, or tourists. Second, plaintiffs must demonstrate that such use actually does devote the allotment to another "public purpose" within the meaning of 43 U.S.C. § 1752(g).

The court finds that plaintiffs may proceed with their compensation claim under 43 U.S.C. § 1752(g) because plaintiffs have demonstrated sufficient facts indicating the possibility that the government may have cancelled their permit in part to devote the rangeland to another public purpose. The court, therefore, denies defendant's motion for summary judgment on this issue because

---

**18.** The court notes that defendant's conspicuous omission of a portion of the relevant sentence regarding when compensation is due under 43 U.S.C. § 1752(g) seriously undermines the credibility of its arguments.

a trial is necessary to address the mixed questions of fact and law regarding whether defendant did cancel the permit in part to devote the rangeland to another public purpose. Compensation under 43 U.S.C. § 1752(g) will be addressed during the taking analysis following the property rights hearing.

## CONCLUSION

This court grants in part and denies in part defendant's motion for summary judgment. While the court does not grant this motion in its entirety, the resolution of the motion has narrowed and clarified the issues for trial.

The court shall hold a limited evidentiary hearing to determine whether plaintiffs own property rights in the claimed water, ditch rights-of-way and forage and the scope of those rights. If plaintiffs prove prior vested rights in the water, encompassing forage rights and vested ditch rights-of-way, then plaintiffs may proceed with this portion of their taking claim. The court also must hold a hearing to determine whether defendant's actions leading to the impoundment and sale of plaintiffs' cattle constituted a taking. Finally, a trial is required on plaintiffs' claim for compensation under 43 U.S.C. § 1752(g) for the value of the improvements which they constructed on the Table Mountain and Meadow Canyon allotments.

The court will hold a telephone status conference on March 19, 1996 at 3:30 p.m. EST. The parties should be prepared to discuss a schedule for discovery and the evidentiary hearing in accordance with this opinion.

**IT IS SO ORDERED.**