William MITCHELL, Jr., and Ann L. Mitchell, Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 97–605L.

United States Court of Federal Claims.

Aug. 12, 1998.

Karen Budd–Falen, Cheyenne, WY, for plaintiffs. Roger T. Williams, Budd–Falen Law Offices, of counsel.

R. Anthony Rogers, Washington, DC, with whom was Assistant Attorney General Lois J. Schiffer, for defendant. Nicholas Targ and John Payne, United States Department of the Interior, and Craig Haughtelin, United States Department of the Navy, of counsel.

## OPINION

MILLER, Judge.

This case is before the court after argument on defendant's motion to dismiss or, in the alternative, for summary judgment. The issues to be decided are whether plaintiffs filed their claim within the applicable six-year statute of limitations and, if so, whether a series of actions taken by the United States Department of the Interior, Bureau of Land Management and the United States Department of the Navy that prevented plaintiffs from grazing their cattle on a portion of previously public lands on which they possessed state-law vested water rights, culminating in the cancellation of certain range improvements associated with plaintiffs' water rights, constituted a compensable taking under the Fifth Amendment.

## FACTS

The following facts are undisputed, unless otherwise noted. William Mitchell, Jr., and Ann L. Mitchell ("plaintiffs") were joint tenants holding title to a parcel of land located in San Bernardino County, California, that is adjacent to a large parcel known as the Pilot Knob Allotment. At one point the Pilot Knob Allotment was entirely within the public domain and under the administrative control of the United States Department of Interior, Bureau of Land Management (the "BLM"). Because plaintiffs' land was adjacent to the Pilot Knob Allotment and also fell within the definition of a base property,[1] plaintiffs and their predecessors in interest were entitled to, and did receive, leases or permit/leases from the BLM permitting them to graze their livestock on the entire Pilot Knob Allotment.

Recognizing that the lands involved in the case at bar are located in a particularly arid region, the BLM allowed those permittees with grazing privileges to construct certain range improvements to facilitate the retrieval and use of water that existed on publicly held lands. Thus, in 1953, the BLM authorized Jack Crawford, one of plaintiffs' predecessors in interest, to build six range improvements that entailed developing wells and springs, so that his livestock could water while grazing on the Pilot Knob Allotment. By 1958 the State Water Resources Control Board (the "SWRCB")[2] recognized that Mr.

---

1. Applicable Federal Regulations define a base property as one capable of supporting livestock for a certain portion of each year. *See* 43 C.F.R. § 4100.0–5 (1997). Absent ownership of such property, one is not entitled to receive grazing privileges.

2. In 1958 the SWRCB was known as the California State Water Rights Board.

Crawford was deriving beneficial use from the six springs and wells and therefore granted him License Nos. 5788, 5789, 5790, 5791, 5792, and 5793, each with a priority date of August 23, 1956.[3] These water rights constitute the property that plaintiffs allege has been taken.

The events underlying the alleged taking of plaintiffs' water rights began to develop in 1963 when the United States Department of the Navy (the "Navy") reserved 50,000 acres of the Pilot Knob Allotment, known as the Mojave B Range,[4] for various military uses including the creation of a Naval Weapons Center, China Lake (the "NWC"). It is at this point that the parties' respective understanding of the events leading up to the alleged taking begin to differ. Defendant's position is that in 1963 the Navy withdrew the Mojave B Range from public use and reserved it for its own exclusive use for a period of 15 years pursuant to Pub.L. No. 88–161, 77 Stat. 279 (1963). Defendant further contends that, when Pub.L. No. 88–161 expired in 1978, the Navy maintained its exclusive use of the Mojave B Range through certain administrative actions.

Plaintiffs take issue with defendant's version of the withdrawal of the Mojave B Range on several grounds. First, according to plaintiffs, the Navy never had exclusive use of the 50,000 acres, as evidenced by the fact that they and their predecessors continued to graze their livestock on the entire Pilot Knob Allotment until 1991. Plaintiffs also suggest that the original withdrawal was for a period of only ten years and subsequently was extended for another five years. At the expiration of the five-year extension, the Navy sought a two-year extension of the reservation, which, while under consideration, caused the reserved portion of the Pilot Knob Allotment to remain withdrawn until April 1980. Plaintiffs maintain that the Mojave B Range was not subject again to a withdrawal until 1994 and therefore was not withdrawn from the public domain when plaintiffs acquired the water rights at issue. Without conceding the exact status of the

Mojave B Range for the period of 1978 through 1994, defendant takes the position that, even if plaintiffs' version of the facts is correct, it is irrelevant to the case at bar because grazing privileges are always subject to termination by the BLM.

The relevance of whether portions of the Pilot Knob Allotment were withdrawn from the public domain is not dispositive, although it is uncontroverted that the sites of the alleged water rights at issue are all within the Mojave B Range portion of the Pilot Knob Allotment. Even when the Mojave B Range was not subject to official withdrawal, the Navy continued to operate the NWC and worked with the BLM to assure that its needs were recognized vis-a-vis ranching operations. For example, subsequent to the reservation of the Mojave B Range, the Navy permitted grazing, subject to its military requirements, on the entire Pilot Knob Allotment. Defendant cites as evidence the fact that the Navy and the BLM entered into an April 1980 Memorandum of Understanding by which the BLM was authorized to regulate grazing on the entire Pilot Knob Allotment subject to the Navy's needs on the 50,000 acres that it previously had withdrawn for military use. Plaintiffs challenge this assertion only insofar far as they take issue with the claim that the 50,000 acres were reserved exclusively for the Navy from 1963 through 1994.

In accordance with the Navy's policy of allowing grazing on the entire Pilot Knob Allotment, the BLM in 1971 entered into a lease with Joe Mendiburu, plaintiffs' immediate predecessor in interest, that allowed Mr. Mendiburu to graze livestock on the entire Pilot Knob Allotment. The one caveat, however, was that Mr. Mendiburu was required to reapply each year to the BLM for continued authorization to graze the entire parcel. Mr. Mendiburu did apply each year and received reauthorization until April 1983, when the policy of authorizing grazing on the entire parcel came to an abrupt halt. Upon receiving Mr. Mendiburu's application, the

---

3. Defendant notes that the licenses granted by the SWRCB correspond to the range improvement permits granted by the BLM in 1953.

4. The 50,000 acres are also known as the China Lake South Range.

BLM and Navy representatives informed Mr. Mendiburu that he would no longer be permitted to graze livestock on the Mojave B Range because the George Air Force Base's Cuddeback Gunnery Training Range now was located on a portion of the Mojave B Range and the presence of this facility would not permit continued unfettered use of the entire Pilot Knob Allotment. From this point onward, the BLM notified Mr. Mendiburu via grazing bills that he was permitted only to graze livestock on portions of the Pilot Knob Allotment not occupied by the Navy.

The importance of the BLM's prohibiting Mr. Mendiburu from utilizing that portion of the Pilot Knob Allotment occupied by the Navy is that the range improvements and alleged water rights at issue in the present controversy are located on Navy lands. Thus, defendant posits that, by preventing plaintiffs and their predecessors from accessing the Mojave B Range portion of the Pilot Knob Allotment, the BLM also prevented them from accessing their range improvements and from utilizing the alleged water rights. Although the Navy recognized plaintiffs' alleged water rights, defendant notes that it was solely for the purpose of permitting plaintiffs' access to their range improvements for the limited purpose of maintaining those improvements.

Plaintiffs vigorously challenge this argument on numerous grounds. First, they assert that the mere act of forbidding grazing on Navy lands is not tantamount to terminating their water rights. In support of this proposition, plaintiffs rely on defendant's failure to cite any documentation of the Navy's intent to prevent Mr. Mendiburu from accessing his range improvements. Moreover, plaintiffs assert that they and their predecessors continued to utilize the entire parcel even after the BLM's grazing prohibition. Second, plaintiffs contend that the BLM did not terminate the range improvements or water rights in 1983 when it restricted their grazing privileges. Plaintiffs cite this fact as evidence that they retained their water rights despite the grazing restrictions.

Although accepting plaintiffs' contentions that they retained limited access to the restricted area for the purposes of maintaining their range improvements, defendant insists that those limited rights do not equate to the ability to graze livestock on the Naval lands. For example, a May 16, 1983 letter from William C. Bonner, a Navy official, memorializes the April meeting during which Mr. Mendiburu was informed that he would no longer be able to graze livestock on Navy lands. This letter also stated that the NWC "should be able to continue to supply water to the off-base portion of the allotment."

Prior to taking title to the base property, plaintiff William Mitchell sent a letter to the Navy dated November 10, 1987, in which he asked for permission to enter the Mojave B Range to collect stray cattle and to maintain facilities used to pipe water onto that portion of the Pilot Knob Allotment in the public domain.[5] According to defendant, this correspondence indicates that plaintiffs were aware that they were not permitted legally to graze their cattle on the Mojave B Range.

Plaintiffs took title to the base property in March 1989. Concurrent with the purchase, plaintiffs contend that they were assigned Mr. Mendiburu's rights in the SWRCB licenses and his BLM-authorized grazing privileges on the Pilot Knob Allotment. It is undisputed that the BLM records contain no evidence of plaintiffs having been assigned the grazing privileges. Once plaintiffs took title to the base property, they continued Mr. Mendiburu's practice of applying on a regular basis to the BLM for grazing privileges. On each occasion that it granted grazing privileges to plaintiffs, the BLM did so on a year-to-year or part-year basis; plaintiffs never received grazing privileges for a term of years, as had been issued in the past to plaintiffs' predecessors. Moreover, none of the authorizations issued by the BLM granted plaintiffs the authority to graze livestock on Navy lands.

The dispute over plaintiffs' ability to graze their cattle on the entire Pilot Knob Allotment began to crystalize in a March 30, 1990 letter from the Navy to plaintiffs, which addressed the topic of unauthorized grazing on

---

**5.** Mr. Mitchell leased the base property from Mr.    Mendiburu prior to taking title in 1989.

Navy lands. Defendant contends that this letter was a reiteration of previous warnings to plaintiffs concerning unauthorized grazing. Despite plaintiffs' remonstrations to the contrary, defendant is correct in that a previous letter dated June 14, 1988, informed plaintiffs that they were no longer authorized to graze their cattle on Naval lands. The March 30 letter also informed plaintiffs that, in order to prevent what the Navy viewed as continued trespassing on its property, the Navy was planning to commence construction on a fence separating the NWC from that portion of the Pilot Knob Allotment available for grazing.

The Navy carried out its promise to erect a fence around the NWC and, by doing so, commenced a project that would preclude plaintiffs from accessing their range improvements and alleged water rights. On May 20, 1990, plaintiffs, by letter, informed the Navy that by fencing off the Mojave B Range the Navy was depriving them of their private property and therefore owed them just compensation in the amount of $65,-000.00. Defendant cites this language as demonstrating plaintiffs' knowledge that they could no longer water their cattle on the Mojave B Range.

Plaintiffs dispute defendant's characterization of their May 20 letter. The letter opens by stating: "If there is to be no more grazing on the Naval Weapons Center...." Plaintiffs construe this clause as nothing more than a proposal for the Navy to consider paying just compensation if—as a result of the fencing—no more grazing was to be permitted on the NWC. Plaintiffs also note that, at the time of this correspondence, they still had access to their water rights because the fence was not yet complete. Having failed to receive a satisfactory response to the May 20 letter, plaintiffs again wrote to the Navy on January 10, 1991. They informed the Navy that the absence of a satisfactory resolution required them to engage legal counsel and that they were withdrawing their offer to sell the water rights and range improvements.

Concomitant with their efforts to work with the Navy to address the grazing dispute, plaintiffs were in contact with the BLM. The BLM sent them a letter dated March 6, 1991, emphasizing that the 1980 Memorandum of Understanding entered into between the BLM and the Navy allowed the Navy to terminate grazing privileges upon 30 days' notice to the BLM. The BLM informed plaintiffs that the Navy had opted to avail itself of this right in 1983, so that since 1983 grazing had been prohibited on the Mojave B Range. The BLM letter also stated that, even though the Navy had chosen to prohibit grazing, it was still willing to allow the reserved lands to be used to provide water to the public portion of the Pilot Knob Allotment.

Upon completion of the fence in the spring of 1991,[6] the Navy and the BLM entered into a second Memorandum of Understanding that purported to assure plaintiffs the continued ability to maintain their water rights and range improvements. In an August 5, 1991 letter to plaintiffs informing them of the recent Memorandum of Understanding, the Navy made clear that plaintiffs were entitled to maintain their range improvements on the Mojave B Range "during periods when livestock are authorized to graze the adjacent Pilot Knob Allotment...." Thus, the August 5 letter reflects defendant's continued assertion that the ability to maintain range improvements on the Mojave B Range is not on par with the ability to graze livestock on the Mojave B Range.

Despite the 1991 Memorandum of Understanding purporting to assure plaintiffs' water rights, on August 15, 1991, the BLM issued, pursuant to what is now 43 C.F.R. § 4120.3–6(b) (1997), a proposed decision, which subsequently became final on September 4, 1991, that canceled 16 of plaintiffs' range improvements—some of which were related to the water rights at issue in the instant dispute. Upon issuing the final decision, the BLM informed plaintiffs that they could either remove the improvements to salvage valuable components or receive com-

---

**6.** *The parties have devoted much effort to the ramifications of the completion of the fence in spring 1991. For the purpose of setting forth the relevant facts, it is sufficient to note that no dispute exists that the fence was completed as of spring 1991.*

pensation. Plaintiffs chose the second option and negotiated an $18,000.00 settlement agreement with the BLM that resolved all outstanding claims against the Government other than the value of any water rights that might have been taken.

In 1995 plaintiffs sold the base property to an entity known as the Wildlands Conservancy.[7] As part of the transaction, plaintiffs transferred their grazing permit. Defendant notes, and plaintiffs do not dispute, that, despite the transaction with the Wildlands Conservancy, plaintiffs filed reports with the SWRCB in 1995 stating that the water rights at issue had been utilized in 1992, 1993, and 1994. However, in 1997—after the filing their suit in the Court of Federal Claims— plaintiffs filed similar reports stating that the water rights had not been used in 1994. When filing both the 1995 and 1997 SWRCB reports, plaintiffs noted on the back of each that in view of the BLM's cancellation of their grazing allotment—a point that defendant challenges—they were investigating alternate beneficial uses of the water rights and would file a request for a change in use in due course. Plaintiffs have never filed such a request. On August 29, 1997, plaintiffs filed their complaint in the Court of Federal Claims seeking just compensation for the taking of their water rights and alleged alternate theories of physical invasion and regulatory taking.

## DISCUSSION

### 1. *Statute of limitations*

In ruling on a motion to dismiss, this court is generally "obligated to assume all factual allegations to be true and to draw all reasonable inferences in plaintiff's favor." *Henke v. United States*, 60 F.3d 795, 797 (Fed.Cir. 1995) (citing *Scheuer v. Rhodes*, 416 U.S. 232, 236–37, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)). However, because defendant's motion "challenges the truth of the jurisdictional facts alleged in the complaint, the ... court may consider relevant evidence in order to resolve

the factual dispute." *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed.Cir.1988). Plaintiff, the non-moving party, bears the burden of establishing jurisdiction by a preponderance of the evidence. *See id.* at 748.

As sovereign, the United States cannot be sued without its consent. *See United States v. Testan*, 424 U.S. 392, 399, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976). Because it is a limited waiver of sovereign immunity, the statute of limitations is to be construed strictly. *See United States v. Mottaz*, 476 U.S. 834, 841, 106 S.Ct. 2224, 90 L.Ed.2d 841 (1986); *see also Hart v. United States*, 910 F.2d 815, 818–19 (Fed.Cir.1990). The Court of Federal Claims lacks jurisdiction over any action that is not filed within the applicable statute of limitations. *See Soriano v. United States*, 352 U.S. 270, 273, 77 S.Ct. 269, 1 L.Ed.2d 306 (1957); *Bath Iron Works Corp. v. United States*, 20 F.3d 1567, 1572 (Fed. Cir.1994). Absent a contrary statutory provision, "[e]very claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues." 28 U.S.C. § 2501 (1994). A claim against the United States Government accrues "when all events have occurred which fix the alleged liability of the United States and entitle the claimant to institute an action." *Japanese War Notes Claimants Assoc. v. United States*, 178 Ct.Cl. 630, 632, 373 F.2d 356, 358 (1967). The statute of limitations will not be tolled unless the facts underlying the claim are either fraudulently concealed or inherently unknowable. *See Menominee Tribe v. United States*, 726 F.2d 718, 721–22 (Fed.Cir.1984).

Without conceding a taking, defendant contends that any such claim is barred by the applicable statute of limitations. The crux of defendant's argument is that the alleged water rights are inextricably intertwined with plaintiffs' grazing privileges. Thus, defendant charges that by forbidding plaintiffs,

---

**7.** In a related transaction, on October 3, 1997, the SWRCB was made aware that the Wildlands Conservancy and Desert Tortoise Preserve Committee, Inc., had taken title to another of plaintiffs' water rights not at issue in the present

controversy. At oral argument plaintiffs placed great import on this transaction. They emphasized that the transfer of this water right evidences that the water rights at issue have value independent from the grazing privileges.

and their predecessors, from grazing on the Mojave B Range the Navy caused the statute of limitations to commence in 1983. At the very latest, defendant contends that the completion of the fence around the Mojave B Range in the spring of 1991 caused plaintiffs' claim to accrue. Agreeing with defendant's reasoning would cause plaintiffs' claim, which was filed on August 29, 1997, to be deemed untimely.

When determining when a claim has accrued, the court is to apply an objective test. *See Fallini v. United States*, 56 F.3d 1378, 1380 (Fed.Cir.1995); *Menominee Tribe*, 726 F.2d at 721. Plaintiffs' knowledge of the fact that the Navy had decided to forbid grazing on the Mojave B Range is not open to serious dispute. For example, on November 10, 1987—prior to taking title to the base property and associated water rights—plaintiffs sent a letter to the Navy asking for permission to access the Mojave B Range to retrieve stray cattle and maintain range improvements other than those at issue in the instant dispute. This correspondence evidences plaintiffs' awareness that cattle were not permitted on Navy lands. In a June 14, 1988 letter from the Navy to plaintiffs, the Navy informed plaintiffs that they could no longer graze cattle on the Mojave B Range, but were entitled to collect strays and maintain their water rights. On March 30, 1990, the Navy sent plaintiffs another letter addressing livestock trespassing. The Navy informed plaintiffs that "[t]his trespass cannot continue. We [the Navy] have discussed this issue with you several times and it is our opinion that this trespass will continue unless we take action." The Navy's response was to construct a fence around the western boundary of the Mojave B Range that would prevent cattle from trespassing on Navy lands.

In addition to copious evidence illustrating that the Navy had forbidden grazing on the Mojave B Range from 1983 onwards, defendant has also put into the record correspondence initiated by plaintiffs addressing what they perceived to be a threat to their water rights. These letters are dated May 20, 1990, and January 10, 1991, and acknowledge that grazing is no longer permitted on the Navy lands and that this action effectively has rendered the alleged water rights useless for stock watering. In light of the grazing prohibition, plaintiffs sought compensation from the Government. Although the parties dispute whether plaintiffs were alleging a taking at this point or simply were proposing a sale, no dispute exists that this correspondence demonstrates plaintiffs' awareness that grazing was not permitted and that erection of a fence was nearing completion.

Plaintiffs acknowledge these communications, but offer several explanations. First, they maintain that the Navy's letters do not speak to the issue of whether plaintiffs retained the ability to water their cattle on the Mojave B Range. This position is untenable. Although the Navy repeatedly represented to plaintiffs that it did not anticipate challenging their water rights, the Navy made clear that cattle were no longer welcome on the Navy's land. Plaintiffs were limited to collecting stray cattle and maintaining existing range improvements—if they complied with the Navy's access procedures. Adopting plaintiffs' assertion that cattle could water on the Mojave B Range, but not graze, would result in a ridiculous scenario wherein plaintiffs would be required to prevent their cattle from eating a single blade of grass while accessing the water rights at issue.

Plaintiffs also contend that their cattle grazed on the Navy lands after 1983 and that they continued to do so even after the fence was completed in the spring 1991. Although these assertions are correct, they are unavailing in that it would be insupportable to toll the statute of limitations because of a continuing trespass by plaintiffs. Moreover, with respect to plaintiffs' contention that they continued to graze cattle on Navy lands after completion of the fence, Mr. Mitchell's own declaration explains "[s]ome ... cattle were on the portion of the Pilot Knob Allotment used by the Navy when the fence was closed. Those cattle continued to frequent the water sources located on that portion of the allotment for approximately one year." Declaration of William Mitchell, Jr., June 10, 1998, ¶ 12. Thus, the undisputed evidence establishes that plaintiffs' use of the water sources located on Navy lands was accom-

plished through trespass and continued despite the Navy's unflagging efforts to prevent such occurrences.

Plaintiffs' legal argument concerning the statute of limitations, which relies heavily on *United States v. Dickinson,* 331 U.S. 745, 67 S.Ct. 1382, 91 L.Ed. 1789 (1947), also is fundamentally flawed. As defendant notes, the Federal Circuit limited *Dickinson* in *Fallini,* 56 F.3d at 1381, in stating:

> Following [*United States v.*] *Dow,* 357 U.S. 17, 78 S.Ct. 1039, 2 L.Ed.2d 1109 (1958), the Court of Claims adopted a similarly narrow interpretation of *Dickinson* and the meaning of "stabilization" in the takings context. In *Kabua v. United States,* 546 F.2d 381, 384, 212 Ct.Cl. 160 (1976), the court noted that in *Dow,* the Supreme Court "more or less limited [*Dickinson* ] to the class of flooding cases to which it belonged, when the landowner must wait in asserting his claim, until he knows whether the subjection to flooding is so substantial and frequent as to constitute a taking."

Given that the circumstances surrounding the alleged taking of plaintiffs' water rights are not analogous to a flooding-type situation, the instant dispute does not fall within the ambit of *Dickinson.*

Plaintiffs nonetheless insist that the extent of the alleged taking did not stabilize until the BLM canceled their range improvements. They place great import on the numerous occasions when the Navy and/or the BLM assured plaintiffs that their water rights would be protected. These purported assurances were insufficient with respect to the water rights at issue, which were granted for the purpose of stockwatering and were never used for any other purpose. Moreover, plaintiffs have stated that attempting to pipe water from the sites at issue to the portion of the Pilot Knob Allotment available for grazing was economically unfeasible. Consequently, completion of the fence should have caused plaintiffs pause with respect to the water rights at issue because they do not dispute that it was economically unfeasible to utilize these sites for stock watering when the cattle had no direct access to the water sources. When the fence was completed in spring 1991, it was no longer possible to bring cattle to the range improvements associated with the water rights at issue; thus, plaintiffs' claim accrued at the latest when the fence was completed.

Although interlocutory in nature, recent decisions issued by Chief Judge Smith in *Hage v. United States,* 35 Fed.Cl. 147 (1996), and *Store Safe Redlands Assocs. v. United States,* 35 Fed.Cl. 726 (1996), are illustrative. In *Store Safe* the court concluded that "as in *Hage,* the water rights and the grazing permits are intertwined." 35 Fed.Cl. at 735. Both cases also recognize the well-settled proposition that grazing privileges are not akin to property rights and are thus not entitled to protection under the Fifth Amendment. *See United States v. Fuller,* 409 U.S. 488, 494, 93 S.Ct. 801, 35 L.Ed.2d 16 (1973). In *Store Safe* Chief Judge Smith in *dicta* addressed the manner in which grazing permits and water rights are intertwined:

> The regulations at issue in this case— grazing regulations—do not directly regulate the property—stockwater rights—that plaintiff claims was taken. The regulations may impact access, and, therefore, may be pertinent to an analysis of the scope and value of the stockwater rights. It is true that the government has the right to regulate grazing access on the public lands; however, such a right does not mean they can deprive landowners adjacent to public land from exercising their right to use their private property. Similarly, the government legally cannot deprive plaintiff of its rights to water without compensation, if the plaintiff actually has those rights.

35 Fed.Cl. at 736.

The relevance of this passage is found in *Store Safe's* recognition of the notion that the proper time to initiate legal proceedings was when the Government deprived plaintiff of access to the alleged water rights. In *Hage* the court went so far as to discount defendant's assertion that plaintiff was required to seek a change in the point of access prior to filing their claim. By rejecting this argument, *Hage* recognized that plaintiff's purported property rights were placed in jeopardy when the Government denied plaintiff access. The same logic is

applicable to the instant dispute in that plaintiffs should have filed their lawsuit when the fence was completed in spring 1991.

In the alternative plaintiffs have suggested that, even if their claim accrued when the Navy completed the fence, the statute was tolled until the BLM issued its final decision in September 1991, because until that time the facts underlying their claim were inherently unknowable. *See Menominee Tribe*, 726 F.2d at 721. However, plaintiffs have conceded that they were aware that they were not legally permitted to graze their cattle on the Naval Weapons Center and that they were aware that the fence was completed in spring 1991. Thus, the facts underlying plaintiffs' claim were not only knowable, but actually were known, by plaintiffs. Because plaintiffs had actual knowledge that they could not graze their livestock on the Mojave B Range, and that any access rights they did possess were for the limited purpose of maintaining their extant range improvements, they cannot rely on *Menominee Tribe*. Although their range improvements were not canceled until September 1991, plaintiffs were prohibited from using their water rights for the purpose for which they were obtained long prior to this administrative action and at the latest when the fence was completed in the spring 1991.[8] Plaintiffs' complaint is barred by the statute of limitations.

2. *Interference with economically viable use*

■ Assuming that plaintiffs' suit was timely filed, the court would not find that a compensable taking has occurred. Recognizing as a verity that grazing permits are a revocable privilege that do not create a compensable expectancy, *see Fuller*, 409 U.S. at 494, 93 S.Ct. 801, plaintiffs have posited that the water rights at issue have an alternative beneficial use involving the desert tortoise and that they are not required to apply to the SWRCB for a change of use in the water rights to benefit the desert tortoise.[9]

The flaw in plaintiffs' logic is that, if the water rights at issue have an alternative beneficial use involving the desert tortoise, then any such use continues unaffected by the construction of the fence and the BLM's final decision canceling plaintiffs' range improvements. By their own admission, plaintiffs sold one of their water rights to the Desert Tortoise Preserve Committee, Inc., and the Wildlands Conservancy after the cancellation of their range improvements. Had the conservation organization been willing, plaintiffs were free to sell all of their water rights at that time, and in all likelihood would have been pleased to do so. In short, plaintiffs cannot claim that they have suffered a taking when they remain fully able to endeavor to sell the water rights at issue to a willing buyer for the benefit of the desert tortoise. Because plaintiffs remain free to avail themselves of the alleged alternative beneficial use, the construction of the fence and the cancellation of the range improvements has not interfered with this specific economically viable use of the property and thus has not effected a taking.[10] *See Lucas*

8. Because the court is of the opinion that plaintiffs' claim did not accrue until the completion of the boundary fence in the spring 1991, defendant's argument that plaintiffs' claim is barred by the Assignment of Claims Act, 31 U.S.C. § 3727 (1994), is without merit. Although it is true that the Navy intended to prevent livestock trespass from 1983 onward, the completion of the fence removed all ambiguity that might have existed previously with respect to whether cattle were permitted on Navy lands. Therefore, because plaintiffs held title to the base property and water rights when the claim accrued, no violation of 31 U.S.C. § 3727 is present.

9. Plaintiffs contend that their claim is ripe vis-a-vis the desert tortoise because any entity acquiring the water rights at issue would be free to seek a change of use to benefit the desert tortoise. Although the court is unsure whether a potential acquiror seeking to benefit the desert tortoise would purchase water rights without a valid change of use permit, it will assume that plaintiffs' allegations suggesting that such an entity would risk a permit denial are sufficient to avoid a dismissal on ripeness grounds.

10. The court notes that the deprivation of all economically viable use of the property is not the only means by which to find a taking. *See Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1019, n. 8, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992). However, in the case at bar, the government actions about which plaintiffs complain have not affected the use of the water rights in association with the desert tortoise in any

*v. South Carolina Coastal Council,* 505 U.S. 1003, 1019, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992).

## CONCLUSION

Accordingly, based on the foregoing, defendant's motion to dismiss based on the statute of limitations is granted. The Clerk of the Court shall enter judgment dismissing the complaint without prejudice for lack of subject matter jurisdiction.

**IT IS SO ORDERED.**

No costs.

manner whatsoever. Therefore, the construction of the fence and the cancellation of the range improvements have not affected adversely any expectations that plaintiffs might have concerning the desert tortoise. *See Penn Central Transp. Co. v. New York City,* 438 U.S. 104, 124, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978) (instructing the court to consider "[t]he economic impact of the regulation on the claimant and ... the extent to which the regulation has interfered with distinct investment-backed expectations....").